[No. 34618. *En Banc.* February 13, 1959.]

THE STATE OF WASHINGTON, *Respondent*, v. JOHN HERBERT BONNER, *Appellant.*[1]

[1]Reported in 335 P. (2d) 462.

RoseLLINI and FINLEY, JJ., dissent.

*Wayne W. Wright* and *Alan L. Froelich*, for appellant.

*Charles O. Carroll, Joel A. C. Rindal,* and *Anthony Savage, Jr.,* for respondent.

OTT, J.—June 3, 1957, John H. Bonner was committed, by the superior court for Pierce county, to the Western State Hospital as a mentally ill person. August 10, 1957, the superintendent of Western State Hospital paroled Bonner as a patient safe to be at large.

October 15, 1957, at approximately 9:50 a.m., Bonner called Kay Lee, sister of his divorced wife, Lilly Bonner, and said: " 'You better go see your sister. I just killed her.' " She notified the police. Lilly Bonner was found dead upon their arrival at her Seattle residence.

· The automobile which Bonner had borrowed from Wayne Chaplin that morning, identified as the one in which Bonner was seen leaving the residence of his deceased former wife, was found abandoned in Everett. October 16th, Bonner was apprehended in Everett in a hotel where he had registered as a guest under an assumed name. At the time of his arrest, a .25 caliber automatic pistol was in his possession. It was identified as the weapon which he had used to kill his former wife.

Upon interrogation by the police at Everett, Bonner signed the following statement:

" 'Statement of John Herbert Bonner, October 16, 1957, 7:00 A.M. Given to Dean R. Phillips, member of Seattle Police Department, Fred L. Mitchell, member of Seattle Police Department, John Hovde, Everett Police Department, George Menzel, Everett Police Department, Mrs. Lenore King, Everett Police Department.

" 'Q. Now John, do you want to start at the beginning and tell us all about the situation. A. It all started in April, April the 13, we will say this started it. I got too many drinks I think. That was on Saturday this year, 1957. I started out about 9:30 on Saturday morning, and I went down town to do my shopping and ended up in a tavern until about 11:30. Then I went home and had lunch, and I had to go to the hardware store and drug store. I had a bad case of shingles on my face, of all places to get it. While I was at the hardware store and drug store I stopped at the tavern, Karl's Tavern, Queen Anne at Gayler. My wife was supposed to be at work at 6:30 P.M., and I was going to be home around 6:00. My wife's name was Lily Ruth Bonner. I got home at five after six instead of six, and I continued to have a can of beer and had something to eat and turned on television. I don't know what happend then, we have in our home a bathroom upstairs and toilet in the basement which I must have gone down to use with a cigarette in my hand and some clothing ignited. The first thing I know my neighbors, Mrs. Morgan and Mrs. Thompson noticed the smoke and we went down and they investigated in the basement and put it out. I went back upstairs and had some more beer and went to sleep. The next thing I noticed a couple of cops, a fireman, and my wife. The policeman said, you are coming with us. My wife said, give me the keys to the car and the house, which I did. So I.

was parked in the Seattle Jail as you know. Then I got out on Tuesday morning on bail. Then there is a lot of time in between — that time I went over to Tacoma I don't actually remember what happened. I went to the Olympus Hotel. Then I decided I didn't want to live any more. I was in Pierce County Hospital for about 13 days and then I went to Western State. I wanted to go there, I needed help and I knew it. I got out the 10th of August, 1957, went back to Seattle on the 10th, went to work five weeks ago yesterday, whatever the date was I started to work again.

" 'I am sending her, my ex-wife, gifts and stuff, buying the child clothing, and still she says I can't see my child, which the court said I could. She had too many boy friends, that is the whole thing. So, on Monday, I called her in the AM at approximately 9:30 (my wife—this last Monday) and I said can't I see you tonight. I asked her what time she went to work and what time she got off work. She said she got off work at 6:30 P.M. I had some fish for her. One of my friends had caught some halibut. I said, how about seeing you about 6:10. She said O.K. I got home about twenty minutes to six and there is a note on my door that the manager of the apartment has put there saying Mrs. Bonner would like to see you before six because she has to go to work at six. It is twenty minutes to six and I have no transportation to get down there. After six I called her up at the shop and I said, can't I see her after she got off work that night. She said no, I have other arrangements— I am going out. I said, how about tomorrow morning before I go to work and she hummed and hawed and said, I don't know. Of course, I know what was in her mind but she didn't come out with it, and finally she said I could go and see the baby yesterday morning, which was Tuesday. Well, I had been told by three different people that she had been chasing around, and even though she isn't my wife any more, I didn't want my son brought up in the environment that her daughter was. Her daughter didn't even know her Dad.

" 'I purchased this gun, the gun that killed my wife, approximately two weeks ago. Yesterday morning I went up to the house at approximately 9:15. I took some stuff to my child and gave her $15.00, and after she was chasing around all night I said you had a rough night last night, she looked terrible. I took playthings for my son, some fish, some peanuts, some candy bars, and two plates with horse figures on them. So when she went down to the basement where she

sleeps then nobody else in the house would know that anybody else was around. Her boyfriends could come and go as she pleased. She had roomers. The house was full of roomers. So when I gave her the money ($15.00) I reached in the hip pocket and said I got something else for you and I pulled out the gun. She said go ahead, and I did. I gave her two shots in the head. My baby, my son, was not in the play pen in the living room, he was in her lap. Then I took off, in Wayne's car. I am talking about that 1950 Chevy. It belongs to Wayne. I can't remember his last name, it is a funny last name. He loaned it to me Monday morning, or it was Tuesday morning. I went back to my apartment, picked up my suitcase, my shaving gear, and that is all. I went out to Greenwood and stopped in at a tavern. On the way out I heard about the accident that had taken place on Queen Anne Hill. When I was in the Greenwood Tavern, I called my sister-in-law, Mrs. Kay Lee, about 11:30 AM on Tuesday. I said you better go see Lily I just killed her, and hung up. I called her at Frederick and Nelson's Beauty Shop. I talked to an old man who comes in there, somebody called Bill. We called him Pogy. I talked to the bartender only to ask for a drink. I stayed there for a while and took off. I came to Everett and the first thing I did was to go and register at the Strand Hotel. I parked my car just a few feet to the right of the hotel entrance. I went upstairs and slept for several hours. Then I went out and ate. Don't ask me where because I don't remember. I had some more drinks, went back up to the hotel and went to sleep and then you guys came and got me. I was registered under the name of George Brownlow from New Jersey, room No. 19. I paid $3.50 for the room.

" 'Q. Approximately what time did you arrive when you registered at the room? A. 12:30 P. M. Q. When you were arrested we found the 25 automatic in the right rear hip pocket. You were fully dressed at the time? A. Yes. Q. How are you feeling right now? A. How do you mean? Q. Are you sick? A. No. Q. Have you been treated all right? A. Yes, in fact I never thought police officers treated convicts as well as they have me. Q. What you have told us is true in every respect? A. Yes, and what happens to me I don't care. Q. You say you purchased this gun about 2 weeks ago? Where did you purchase it? A. That is something I am not going to tell you because I don't want to get the company in trouble. I purchased the gun for the reason of killing my wife. Q. How long had you planned this? A.

While I was in the hospital during June, July and August. Q. How many times did you shoot your wife? A. Twice. Q. Where did you shoot her? A. In the head. Q. What did she say before you shot her? A. She said, go ahead. Q. Did she seem frightened? A. No, she didn't even scream. Q. After you shot her did you examine her? A. No, I just took off. Q. This statement that you have given is a true and voluntary statement which you give of your own free will. A. Yes. Q. It was not given under force or duress of any kind. A. Absolutely not. In fact, we are having coffee and toast.' "

Two other statements were subsequently signed by Bonner on October 17th and 19th, each describing the incidents before and after the homicide substantially as in the first statement.

October 23, 1957, Bonner was charged, by information, with the crime of murder in the first degree. Attorney Wayne Wright was appointed by the court to represent Bonner, an indigent defendant. October 29, 1957, the court granted Bonner ten days' time within which to enter his plea to the charge. November 15, 1957, he was arraigned, and entered a plea of not guilty. December 20, 1957, attorney Alan Froelich was appointed by the court as additional counsel for the defendant.

The attorneys filed a motion in this criminal proceeding, in which it was requested that Bonner's parole in the mental illness proceeding be revoked; that Bonner be returned to Western State Hospital, and that further proceedings in the criminal trial be stayed. The motion was supported by affidavit of counsel alleging, *inter alia*, that Bonner had been adjudged a mentally ill person, and that he had been paroled from the hospital, but that the disability of the adjudication had not been removed. The affidavit further alleged:

"Affiant is informed and believes and therefore alleges the law to be that one committed as mentally ill cannot and should not be held for trial for a crime *involving manifestation of a specific intent*. No proceedings have been instituted to determine the sanity of defendant at the present time.

"Affiant alleges that proper procedure for the court having jurisdiction be to revoke the parole of the defendant from the

Western State Hospital, and return the defendant thereto for hospitalization. Further proceedings in King County Cause No. 31197 *should be stayed* and no action taken thereon until such time as sanity *vel non* be adjudicated by a court of record.

"Affiant is informed and believes and therefore alleges the fact to be that serious harm will be done the rights of defendant should he be compelled to go to trial on this *charge in his present condition.*" (Italics ours.)

The motion was heard on December 30th and 31st, and denied. January 13, 1958, this cause proceeded to trial. At the beginning of the trial, defense counsel orally moved for a revocation of the mental illness parole, and a stay of the criminal proceedings. The motion was denied. The state introduced its evidence and rested its case. The defendant did not testify in his own behalf or offer any testimony in support of his plea of not guilty. The jury returned a verdict of guilty of murder in the first degree, and made a special finding that the death penalty be imposed. Defendant's motion for a new trial was denied.

From the judgment and sentence imposed upon the verdict of the jury, the defendant appeals.

Appellant makes four assignments of error, all of which relate to the failure of the court to order the parole revoked, the appellant recommitted to Western State Hospital, and the criminal proceedings stayed.

 In 1951, the legislature enacted a civil statute which has as its purpose the hospitalization, treatment, and rehabilitation of persons having a mental disease. RCW 71.02. An adjudication of mental illness does not carry with it any element of criminality. Commitment to a hospital for treatment and observation is not, in any sense, a penal commitment. Although the legislature granted authority to the superintendent of the hospital to parole a patient (RCW 71.02.610), the parole simply indicates that the patient's condition, in the opinion of the superintendent, has improved to such an extent that he is safe to be at large. RCW 71.02.620 provides that

"Whenever it shall be made to appear to the superior court of any county that any paroled patient found in such county has become unsafe to be at large, said court shall order such patient apprehended and returned to the hospital from which he was paroled . . ."

Revocation of the parole must be in a statutory proceeding, where the mental illness of the patient can be or has been determined. If the petition for revocation is not presented to the court of original commitment, the legislature has authorized any superior court in which it is *made to appear* that any paroled patient found in such county *has become* unsafe to be at large, to order the patient apprehended and returned to the hospital from which he was paroled. A superior court other than the court of original jurisdiction must make two findings, (1) that the patient has been previously adjudicated to be mentally ill and paroled, and (2) that because of the former mental illness the patient "has become" unsafe to be at large and should be returned to the hospital.

We are here concerned with the revocation of a parole by a court other than the one of original jurisdiction. The legislature did not indicate in what manner it should "be made to appear" to the court that the parole of a mentally ill person should be revoked. In the instant case, since there had been no previous proceeding in King county involving Bonner's alleged mental illness, it follows that the only legal way such condition could be "made to appear" to the superior court would be by a petition alleging the facts in a statutory proceeding. RCW 71.02.620.

If revocation of the parole of a mentally ill person is requested, it must be accomplished in the manner prescribed by statute, in a court exercising its statutory jurisdiction. In the instant case, the appellant was requesting the court, exercising its criminal jurisdiction in a criminal proceeding, to revoke the parole of a person adjudicated, in a statutory proceeding, to be mentally ill. The superior court, in the criminal proceeding and exercising its criminal jurisdiction, was without authority to enter the order of

revocation requested, and its refusal to do so in that proceeding was proper.

 That part of the motion which requested a stay of the trial on the criminal charge was properly before the court at the time of the pretrial hearing, and again at the beginning of the trial.

At the pretrial hearing, appellant contended that he was charged with the commission of *"a crime involving manifestation of a specific intent,"* and that he should not "be compelled to go to trial on this charge *in his present condition."* (Italics ours.)

 The judge who heard the pretrial motion properly requested that medical testimony be furnished to aid him in determining the issue of Bonner's present condition, mental or otherwise, which might be material as affecting the request for a stay of the criminal proceedings.

A psychiatrist testified that, at the time of his examination of Bonner on October 21, 1957, Bonner was, in his opinion, sane, and that he believed Bonner to be presently competent to comprehend the nature of the charge and to aid in his defense. The appellant offered no controverting testimony or any evidence relating to Bonner's "present condition," in support of his request that the trial in the criminal case be stayed.

The court did not err in refusing to grant a stay of the criminal proceedings at the pretrial hearing because of Bonner's alleged mental incapacity to stand trial.

The motion and argument made at the beginning of the trial were limited to the single proposition that one adjudicated to be mentally ill cannot be tried for any criminal offense.

Appellant's counsel orally stated the issue as follows:

"Now, the motion is to the effect that the defendant be not tried under this Information, that this Court revoke his parole from the Western State Hospital and return him—order him returned—to the custody of the superintendent of the Western State Hospital. . . .

"Now, we do not make the plea of not guilty by reason of temporary insanity or mental derangement or mental ir-

responsibility. We make the plea of 'not guilty' but we also urge that no superior court has jurisdiction to have a trial on this Information while we have the unanswered question of the mental illness of the defendant. . . .

"I don't want to be understood as urging the person who was committed from Pierce County as insane. He was committed as mentally ill. I have not found any authority precisely in point to aid the Court on this question. All we have is the statute which gives the Court—which directs the Court—in mandatory language that the parole be revoked and that the patient be returned to the hospital. . . .

". . . We do not say that we need the testimony of psychiatrists as to his present condition. We say that under the statute this Court should do nothing but revoke his parole and return him to the hospital. At such time as there is a proper adjudication made, whenever it may be, then if the State wishes this Information can be prosecuted. It should not be done now."

In ruling upon the motion, the trial judge reasoned as follows:

"One can have many types of mental illness or, if you prefer to use the word, insanity. That would be no protection to him or her from the commission of a crime. I would say that even if a crime such as murder in the first degree, which is the charge here and with which we are concerned here, were actually committed in one of the hospitals for mental illness that the superior court could, if it saw fit, proceed with the murder trial and that it might well be justified in proceeding as it would in any ordinary case to the end, and if the end were conviction and punishment that it would still in procedure be entitled to precedence and priority over the procedure provided in the section upon which counsel for the defendant rely.

"Prima facie, such a course of action might be difficult for many people to understand as being sound. But assuming it were an actual patient in a hospital, he still has all these rights which are not invoked by counsel in the present case—at least, at this time.

"He has the right to raise the question of his capacity to stand trial. And I may say that this court is willing to grant a hearing in this case if a proper application is made on that phase of the matter—his capacity to stand trial.

"His second right is his right to plead mental irresponsi-

bility as a defense which has not been done here up to the present time.

"So the course of action urged by counsel for the defendant that the processes of this court should yield and give way to the function and authority and responsibility of the superintendent of the state hospital to which this defendant had formerly been committed is, in the opinion of this court, giving a secondary or alternative procedure precedence over the more important procedures. In view of the apparent conflict between the two statutes I think the lesser must yield to the greater. All of the rights of the defendant can properly be safeguarded in this court."

█ The trial court based its decision upon the priorities of the procedures, and properly so. The ruling is in conformity with the intent of the 1951 legislative act, which specifically provides that "Nothing in this chapter shall be construed as affecting the laws of this state relating to the criminally insane . . ." RCW 71.02.020.

█ That the legislature intended that no civil or criminal proceeding should supersede or stay the trial of one charged with the crime of murder in the first degree, is further supported by RCW 10.19.010. The cited statute provides that one charged with such an offense is not subject to bail. Hence, a superior court, exercising criminal jurisdiction of a person charged with a non-bailable offense, has exclusive jurisdiction and control of the accused.

█ From the above-cited statutes, we conclude that the legislature did not intend that the 1951 mental illness act should supersede or interfere with the criminal processes of this state.

█ A person committed for hospitalization because of a mental disease and hospitalized, or one committed and paroled from the hospital, is not immune from trial for the commission of a criminal offense, because of the adjudication and commitment or parole. It is the *fact* of mental incompetency, and not the *adjudication* of mental illness, that determines one's inability to form an intent to commit an offense, or his inability, after an offense has been committed, to aid in his defense.

▇▇▇ At the trial of this case, the appellant elected to stand upon his *adjudication* of mental illness as a defense, rather than the fact of his mental incapacity to commit the offense or to defend in the criminal proceeding. If mental incapacity is relied upon as a defense, it must be specially pleaded.

In *In re Kenstrip v. Cranor*, 39 Wn. (2d) 403, 235 P. (2d) 467 (1951) it is stated:

"We said in *In re Burnett*, 30 Wn. (2d) 160, 191 P. (2d) 283:

" 'It is the settled law that every person is presumed to be sane and competent; but, when one is adjudged to be of unsound mind and under guardianship, the presumption arises in favor of the continued existence of the incompetency, and, if recovery is claimed to have occurred, the burden of proving it is upon the person making the allegation. [Citing cases.]'

"Thus, at the time of arraignment, petitioner was presumed to be insane.

"It may be frankly conceded that a mental condition can vary from time to time, and that the presumption of the continuance of such a condition is rebuttable. Nevertheless, an adjudication as to a mental condition would be an idle gesture without such a presumption. We do not mean to say that one adjudged insane gains permanent immunity from punishment for crime. We do mean that, while so adjudicated, the presumption requires the appointment of an attorney as next friend and counsel, prior to arraignment,

. . .

" . . . Upon the trial of a criminal charge, the defense of insanity must be pleaded and proved by the defendant. A *prima facie* showing by competent evidence takes insanity to the jury as a separate issue, and the defendant thereby has his day in court upon it. This dispenses with the need for an adjudication of the issue prior to trial, because due process requires but *one* day in court."

▇▇▇ The defense of insanity is not raised by a plea of not guilty. Such a plea places upon the state only the burden of establishing, beyond a reasonable doubt, all of the material allegations of the offense charged.

▇▇▇ To the trier of the facts, there is a presumption of mental incapacity raised by the proof of a mental illness adjudication, but the presumption is rebuttable. *In re Kenstrip*

*v. Cranor, supra; State v. Hartley,* 25 Wn. (2d) 211, 170 P. (2d) 333 (1946).

 The jury in the instant case, however, were never given *proof* of the commitment; hence, appellant's right to have the presumption considered by the jury was knowingly and purposely waived. The attorneys representing the appellant elected not to permit the defense of insanity to be entered for their client. Their decision undoubtedly was supported by a good reason. The appellant was represented by able counsel, and was given a fair and impartial trial.

We find no merit in any of appellant's assignments of error.

The judgment and sentence is affirmed.

WEAVER, C. J., MALLERY, DONWORTH, FOSTER, and HUNTER, JJ., concur.

HILL, J., concurs in the result.

ROSELLINI, J. (dissenting in part)—I agree with the majority that the trial court did not err in refusing to grant a stay of criminal proceedings because of the alleged mental condition of the defendant; but I disagree with the majority in so far as they hold that because the motion to revoke the defendant's parole was introduced in the criminal action rather than in a separate civil proceeding, the court was without authority to consider the motion.

This court having determined that the motion was properly denied, the holding that the motion was improperly before the court is unnecessary. I am fearful that the procedure prescribed by the majority may be accepted as the rule; and I do not believe such a rule is warranted by this case or by the statutes.

RCW 71.02.620 provides:

"Whenever it shall be made to appear to the superior court of any county that any paroled patient found in such county has become unsafe to be at large, said court shall order such patient apprehended and returned to the hospital from which he was paroled . . ."

While a procedure to be followed in an adjudication of insanity is prescribed by RCW 71.02.090-300, no special

procedural requirement is set forth in RCW 71.02.620, providing for the return of a paroled patient when it is made to appear to the superior court that he is unsafe to be at large. The majority say that the showing must be made before the court sitting as a civil court and in a separate "proceeding." This simply means that the motion cannot bear the title of a criminal proceeding in which a patient happens to appear before the court, but must bear a different "civil" title, and that if it is not properly entitled, the court may not consider it. This appears to me to place too much emphasis on form. I do not see the efficacy of it and I do not find the requirement in the statute. The purpose of the statutory provision is to authorize any superior court, before which a proper showing is made, to see that a dangerous incompetent is returned to the hospital to which he has previously been committed in a statutory proceeding which protected his rights. It seems to me that RCW 71.02.620 is broad enough to allow any superior court in which the patient appears for any reason, upon a proper showing, to order him returned, regardless of the circumstances under which the patient comes before the court. The majority do not say that any right of the patient would be violated if the court had this power, or that any reason of public policy forbids it; but they simply construe the provision as requiring a separately entitled proceeding. In my opinion they have read the requirement into the statute for no useful purpose.

If the majority are correct, the court might release a dangerous parolee simply because the petition, upon which he was brought before the court, was improperly entitled. The purpose of the statute is to protect society as well as the mentally ill person. The strict construction of this procedural requirement, adopted by the majority, does not expedite this purpose but hinders it, and for this reason I have expressed my disagreement with the majority of the court.

FINLEY, J., concurs with ROSELLINI, J.

May 21, 1959. Petition for rehearing denied.