[No. 38391. En Banc. March 14, 1967.]

THE STATE OF WASHINGTON, *Respondent,* v. JOHN WILLIAM HAWKINS, *Appellant.*\*

*\*Reported in 425 P.2d 390.

John L. LaLonde and Steven A. Memovich, for appellant (Appointed counsel for appeal).

R. DeWitt Jones and C. Brent Nevin, for respondent.

HILL, J.—John William Hawkins was charged with first-degree murder in connection with the death of two minors. On count 1, involving the death of Fred Walch (15), the jury brought in a verdict of not guilty by reason of insanity or mental irresponsibility, with the further finding that he was not insane or mentally irresponsible at the time of trial but that there was such a likelihood of a relapse or recurrence of the insanity or condition of mental irresponsibility that he was not safe to be at large. On count 2, involving the death of Bonnie Walch (16), the jury brought in a verdict of guilty of murder in the first degree with the recommendation that the death penalty be inflicted.

It is from the judgment of guilty on count 2 and the sentence of death imposed thereby that this appeal is taken.

The only possible defense was insanity. Hence, we trace the appellant's prior contact with a mental institution upon which his counsel placed great reliance.

The appellant had been involved in law violations in New Mexico commencing about 1957. In 1959, he was sentenced to the penitentiary for grand larceny and was paroled in 1961. He was married while on parole. In early August, 1962, the appellant and his wife separated and thereafter he kidnaped her at gun point. He was arrested and confined in the Bernalillo County jail, where he attempted suicide on at least two occasions. A sanity hearing was conducted on September 14, 1962, and Dr. Alan Jacobson, a psychiatrist who examined appellant, testified that at that time he recommended appellant's commitment to the New Mexico State Hospital for two purposes: one for the treatment of appellant's then depressive condition; and the other for further investigation of the patient's mental status at the time of the commission of the crimes with which he was charged.

The court found that the appellant was mentally ill and on September 21 committed him to the New Mexico State Hospital for treatment,[1] with instructions that he was not to be released without prior order of the court and the district attorney. After a treatment of less than three weeks, he was returned to the Bernalillo County jail "as having received maximum hospital benefits." On October 22, while in that jail, he was again examined by Dr. Jacobson who found that "Apparently the depression had completely disappeared." He was then returned to the penitentiary as a parole violator. Two years later, on October 15, 1964, he was released from the penitentiary with instructions to leave the state within 48 hours. He and a brother left Albuquerque, New Mexico, about October 17, intending to go to Alaska where another brother resided.

En route to Alaska, they stopped in Portland, Oregon, where the appellant met Carol Walch who was then securing a divorce from her husband. (The appellant claims to have contributed $75 of the divorce costs.) In the latter part of October, he took up residence in the Walch home in

---

[1] It is this commitment for treatment for mental illness upon which the defense relies as an adjudication of mental incompetence.

Vancouver, Washington, where Mrs. Walch lived with three of her children: Bonnie, Fred, and Ranae (9 years of age). Some differences developed between the appellant and Mrs. Walch, and he returned to Albuquerque in November. Mrs. Walch, Bonnie, and Fred each wrote asking him to come back, and he returned to Vancouver about Thanksgiving time.

During his first sojourn in the Walch home he had slept on a settee in the living room, and Bonnie and Mrs. Walch had occupied one upstairs bedroom. After appellant's return to the Walch home from New Mexico, he and Mrs. Walch occupied this bedroom and Bonnie was given a room in the basement. The two older children apparently resented this arrangement.

Appellant's residence in the Walch home under these circumstances continued until the evening of December 10, 1964. Mrs. Walch left with Bonnie that evening at about 7:30 p.m., leaving appellant, Fred, and Ranae at the home. Bonnie, after visiting with friends, returned sometime after 11 p.m. Mrs. Walch came home shortly after 1 a.m. December 11. The appellant was there. After some discussion, he told her she had better call the police, and left. Mrs. Walch thereafter discovered Bonnie's body and notified the police.

After leaving the Walch home in the early morning of December 11, the appellant stole a car and, not having the key, wired the ignition. He abandoned the car at a service station about 5 miles south of Chehalis at about 10 or 11 a.m. December 11. From there, he rode with a truck driver to the north end of Seattle, leaving the truck at about 4 p.m. The same evening (December 11) at about 9 p.m., he was picked up by the border patrol and turned over to the Whatcom County sheriff.

As to what transpired in the Walch home between 7:30 p.m. (December 10), when Mrs. Walch left, and shortly after 1 a.m. (December 11), when she returned, we have only the admissions made by the appellant while being transferred from the Whatcom County jail to the Clark County jail: that he had attacked Fred with a hammer and,

later, Bonnie; and the mute, but eloquent, evidence of the bodies and the bloodstained clothing of the appellant. While he at no time testified as to the stabbing, the appellant's statements to Mrs. Walch and to his psychiatrist show that he knew he had killed both Fred and Bonnie.

Additional facts will be noted as made necessary by a consideration of the various assignments of error.

We shall first consider the claimed errors relating to pretrial matters.

*Re: Motion for change of venue.*

The motion for a change of venue was made January 6, 1965, and denied January 17, 1965. The decree denying the motion specifically found that

> none of the principals in connection with the criminal charges are particularly well known in this community, and that there is no feeling established on the part of the public generally that would indicate in any way that John William Hawkins could not receive a fair trial.

The court affirmatively found that Hawkins,

> can receive a fair and impartial trial in Clark County . . . and there is no reason in fact, to . . . grant a change of venue.

It was 5 months later that the case went to trial, and the appellant points to nothing that transpired in the examination of the prospective jurors, or at any other time, which indicates that he was in any way prejudiced by reason of anything that the prospective jurors had heard or read.

■ Change of venue in a criminal case is a matter within the sound discretion of the trial court, and its determination will not be reversed unless there is an abuse of that discretion. *State v. Sayward,* 63 Wn.2d 485, 387 P.2d 746 (1963); *State v. Beck,* 56 Wn.2d 474, 488, 349 P.2d 387 (1960); *State v. Collins,* 50 Wn.2d 740, 314 P.2d 660 (1957); *State v. Bird,* 31 Wn.2d 777, 198 P.2d 978 (1948). We find no abuse of discretion in this case.

*Re: Trial court's order requiring the appellant to proceed to trial.*

■ The basis for the contention that the appellant was not competent to stand trial was that he had been adjudicated as mentally ill on September 21, 1962. The extent and character of that mental illness is discussed later. The so-called adjudication has little relevance on the limited issue then presented of whether at that time the appellant fully understood what was taking place and had the mental capacity and ability to aid in his own defense. See *State v. Bonner*, 53 Wn.2d 575, 335 P.2d 462 (1959).

The hearing on the issue of whether the appellant was competent to assist in his own defense was held May 14, 1965 (trial began on May 17). The trial court, on the basis of the evidence presented and personal observation of the appellant in court and "his responsiveness in respect to testimony given by various witnesses and statements made in connection with this hearing," made the following findings:

> [T]hat the defendant is aware of the nature of the crimes charged against him and while he has stated that he does not wish to discuss the crimes and wants to put them out of his mind, that this has been a deliberate, intentional and volitional idea and it is not established by any evidence that he could not, if he desired, fully relate to counsel, his doctors, or any other persons his actions in connection with the crimes charged against him and/or his previous history and matters which would relate to his special defense of insanity; that while the court finds that the defendant is antisocial and has demonstrated suicidal impulses, that all proof falls short of establishing inability of the defendant to assist in a proper defense of the charges against him; that the court finds that the defendant himself has, under conditions where he has been mentally alert and conscious of his statements, advised that he wanted the trial against him to proceed and did not want any further delays in the prosecution; that from the letters in evidence,[2] it is clear to the court that he has voluntarily expressed a desire to have this trial proceed; that he recognizes and understands the

---

[2]The appellant urges that the letters to which reference is made were improperly seized and could not be considered for any purpose. The propriety of the use of the letters for any purpose will be considered under the assignment of error next discussed.

nature of the case pending against him and has a sense of appreciation with respect to possible penalty in the event of conviction.

On the basis of these findings, an order was entered refusing any further continuance.

The special verdict of the jury, which had observed him throughout the trial, was that he was then mentally competent.[3]

The appellant has presented nothing which contradicts the findings of the trial court and the verdict of the jury on the issue of his competency at the time of trial. We find no merit in this assignment of error.

From the pretrial matters, we turn now to a consideration of the claimed trial errors which we will discuss under the general headings of Admission of Exhibits, Instructions Given and Refused, and Claimed Mistrial.

*Admission of Exhibits*: Error is claimed in receiving in evidence photocopies of three letters written by the appellant to his mother in Albuquerque, New Mexico, while he was detained in the Clark County jail awaiting trial.

These letters were placed in stamped, addressed, but unsealed envelopes for inspection by the jail authorities before the envelopes were sealed. Hawkins was told that his mail would be inspected. While in the possession of the jail authorities, for inspection purposes, photocopies were made of the letters.

Needless to say, and for very obvious security reasons, practically every jail and penal institution examines the letters and packages, incoming and outgoing, of all inmates. Certainly, there can be no claim of invasion of privacy under such circumstances. *State v. Grove*, 65 Wn.2d 525, 398 P.2d 170 (1965), is decisive on this phase of the case.

The photocopied letters did not contain any incriminating statements. They were originally used at a hearing

---

[3]The verdict was phrased in the negative, *i.e.*, that his insanity or mental irresponsibility did not continue and exist at the time of trial.

held to determine whether appellant was competent to aid in his own defense. They were offered to establish the state of mind and mental competency of the appellant at the time when the defense was claiming that appellant was incapable of assisting or communicating with his attorneys. They were admitted at the trial itself, on rebuttal by the state, to meet the defense of then existing insanity.

The examination and photocopying of these letters all occurred prior to their being placed in the United States mails, and the arguments and citations relating to interference with the United States mail are not in point.

These letters were not subject to any rule or statute which would restrict their use for the purpose for which they were introduced in this action, *i.e.*, to show that the writer was mentally competent at the time of trial.

■ Error is also assigned to the admission of a series of color pictures showing the condition of the bodies of the slain children at the time they were found, and the nature of their wounds. The pictures were competent to show the nature of the wounds and exactly what was found at the time the officers commenced their investigation, and were properly admitted. *State v. Griffith*, 52 Wn.2d 721, 328 P.2d 897 (1958); *State v. Farley*, 48 Wn.2d 11, 290 P.2d 987 (1955); *State v. Nyland*, 47 Wn.2d 240, 287 P.2d 345 (1955).

■ Error is also assigned to two other exhibits: a butcher knife (exhibit No. 2) found in the drawer in which the appellant kept his clothes in the Walch home, and a knife (exhibit No. 3) belonging to the appellant which was found about a block from the Walch home on the morning of December 11. The first was evidence that the appellant had possessed an instrument with which the fatal stabbing might have been executed. The finding of the second knife evidenced appellant's desire, at the beginning of his flight on the morning of December 11, to rid himself of any possibly incriminating article. Evidence material to any issue, if under no excluding disability, is admissible. *State v. Gersvold*, 66 Wn.2d 900, 406 P.2d 318 (1965); *State v.*

*Duree,* 52 Wn.2d 324, 324 P.2d 1074 (1958); see also 5 Meisenholder, Wash. Prac. § 38.

We see no error in the admission of any of these exhibits into evidence.

*Instructions Given and Refused:* It is urged that instructions Nos. 4 and 8 should not have been given in the present case, and that proposed instruction No. 6 should have been given.

Instruction No. 4 is the usual instruction where the defense of insanity is interposed, *i.e.,* that the defendant is presumed to be sane and mentally responsible and to intend the natural and usual consequences of his own acts, and that the burden of proving insanity or mental irresponsibility is upon the defendant.

Instruction No. 8 related to the proof of intent and reiterates the rule that a sane person is presumed to intend the consequences of his voluntary acts.

There is no contention that the instructions are not proper statements of the law, but the objection is that the law was not applicable to the situation in the present case.

The major premise of the appellant's position is that the commitment of September 21, 1962, to the New Mexico State Hospital for treatment of mental illness (see page 700, *supra)* amounts to an adjudication of insanity or mental incompetency on the part of the appellant, and that, there being no formal order adjudicating a restoration to mental competency, a presumption exists that the appellant was, at the time of the killing of the two children and at the time of trial, insane or mentally incompetent; and the burden was on the state to prove that appellant was sane or mentally competent at the time the killings were committed.

Proposed instruction No. 6, which states again the appellant's theory, would have told the jury that:

[W]hen one is adjudged to be of unsound mind, the presumption arises in favor of the continued existence of the incompetency, and the burden of proving recovery is upon the one alleging it by a preponderance of the evidence.

■ There are many and varied types of mental illness. A commitment to a mental hospital "for treatment" followed by a release from the mental hospital in less than 3 weeks, with the notation on the Certificate of Discharge that he had received "maximum hospital benefits" (occurring more than 2 years before the commission of the homicides), does not change the burden of proof on the defense of insanity, nor does it place the burden on the state to prove a restoration to sanity and mental competence. See *State v. Allen,* 67 Wn.2d 238, 406 P.2d 950 (1965), and *State v. Schafer,* 156 Wash. 240, 286 Pac. 833 (1930).

We cannot accept the major premise of the appellant that this commitment for treatment on September 21, 1962, was an adjudication of insanity or mental incompetence. Not accepting the appellant's premise, we do not agree with his conclusions that instructions Nos. 4 and 8 should not have been given, and that instruction No. 6 should have been given.

Error is assigned to the giving of instructions Nos. 10, 13, and 14.

Appellant says that, based on instruction No. 10, he could have been found guilty of murder in the first degree if the jury found that the fatal wounds had been inflicted with either a blunt instrument or knife and caused death; and that, based on instructions Nos. 13 and 14, he could have been found guilty of murder in the second degree if the jury found that the fatal wounds had been inflicted with either a blunt instrument or knife.

The objection is to the use in the alternative of the words "blunt instrument or knife" in these instructions. The appellant had admitted the hammer assault on each of the children, but had said nothing about a knife. The doctor who had made the examination testified that the hammer assault had preceded the stabbing in each case, and that death had resulted in each case from the stabbing (conceding that death could have ultimately resulted in each instance from the hammer blows). The fanciful suggestion that the jury might have determined that someone other

than the appellant did the stabbing, and still have found the appellant guilty merely because he did the hammering, does not merit consideration.

It is urged that instruction No. 19, relative to the consideration and weight to be given the testimony of experts, was erroneous because it included the sentence:

Such testimony is to be canvassed as in the case of any other witness. . . .

It is said that the terminology with respect to "canvassing" the testimony of expert witnesses is erroneous and confusing in that it connotes the counting of votes as opposed to weighing the testimony and giving it such weight as it is entitled to be given. The dictionary includes under "canvass": "to examine in detail; to sift; discuss." While we do not commend the addition of the quoted sentence to an otherwise adequate instruction, we cannot believe that the jury was in any way confused or misled thereby.

Appellant urges that his proposed instruction No. 5 should have been given in place of No. 19. Either presents an accurate statement of the applicable law, and there was no reason to give them both; and whether one was preferable to the other was a matter of choice.

Appellant assigns error to the failure to give proposed instructions Nos. 2 and 4.

Proposed instruction No. 2 was a long, slanted and argumentative instruction on the presumption of innocence. The trial court covered everything that needed to be said in instruction No. 15, and properly refused to give the proposed instruction.

Proposed instruction No. 4 would have informed the jury that no inferences were to be drawn against any party because of the making of any objections, exceptions, or motions. It was argued that such an instruction should be given as a collateral instruction to the instruction advising the jury that the appellant had the right to remain silent.

No authority is cited to support the position that it is error not to give such an instruction. No prejudice is pointed out as resulting to the appellant from the failure so

to do. The proposed instruction is an underestimation of the intelligence of a jury. The trial court did not err in refusing to give the proposed instruction.

*Claim of Mistrial:* The prosecuting attorney, in framing a hypothetical question to a psychiatrist, posed as one of the matters to be considered:

[H]is statement to you that "I pled guilty," that he stated that he had pled guilty to the present charge.

Counsel for appellant, at this juncture, moved for a mistrial on the grounds that the appellant had never entered a plea of guilty and that the statement that he had entered such a plea was grossly prejudicial.

 It is conceded that no plea of guilty was ever entered. However, the testimony was before the jury from Captain Eugene White concerning the appellant's statement about his attack on Fred Walch with a hammer and later his attack on Bonnie with the same implement. Captain White also testified that the appellant said he had told Mrs. Walch that the children were dead and that she had better call the police.

The defense psychiatrist, Dr. Ivor M. Campbell, testified that the appellant,

told me . . . that he impulsively attacked the boy, killing him with the hammer, and later the girl in the same way.

On cross-examination, Dr. Campbell amplified his account of the appellant's statement to him as follows:

The boy, he states, took a swing at him and he picked up a hammer and hit him. . . . The daughter started screaming when she saw her brother there, and she was hit with the hammer.

Dr. Wendell H. Hutchens, the state's psychiatrist, had also interviewed the appellant and later testified as to the appellant's statements to him: "I told them I did it. What more do they want."

In that posture of the case, considering all of the evidence and the appellant's admissions to his own psychiatrist that he had attacked and killed the children, we do not

believe that the reference to his having "pled guilty" was prejudicial, and that the jury understood the distinction between his admitting the killing of the children and pleading guilty to murder. The real issue was not whether he had killed the children, but whether he was sane and mentally competent at the time. The jury recognized this in the verdict.

There remain two questions for consideration: Whether the appellant has been denied certain constitutional rights, and whether the verdicts on counts Nos. 1 and 2 are consistent.

It is claimed that when the appellant made his confession to Captain White, while being transported from Bellingham to Vancouver, Washington, he had not been advised of his rights against self-incrimination and of his right to counsel.

The record is squarely to the contrary. Captain White testified that he did advise the appellant of his right to remain silent and to have an attorney, and that the appellant's response was, "I don't want an attorney. I've had it."

The trial judge held a thorough and complete hearing under our rule on confession procedure (Rule of Pleading, Practice and Procedure 101.20W), and determined that the statements made were voluntary on the part of the appellant and had not been obtained in any manner which violated his constitutional rights to remain silent and to consult counsel. The record supports that determination. The appellant himself—no novice in matters pertaining to criminal law—testified during this hearing (but not at the trial). It was apparent that he was cognizant of the subject under discussion. He made no contention that there was any coercion. While he never stated that he had not been advised of his constitutional rights, he did say that he did not remember that Captain White had advised him concerning his right to remain silent or his right to an attorney. Failure of a defendant to recall or remember is not a denial that he was properly advised.

*Escobedo v. Illinois,* 378 U.S. 478, 12 L. Ed. 2d 977, 84 Sup. Ct. 1758 (1964), and the cases cited by the appellant are simply not in point. None of these cases held that a defendant who knows or has been advised of his constitutional rights of silence and of counsel may not waive them. The following cases fully support the proposition that these rights may be waived. *Johnson v. Zerbst,* 304 U.S. 458, 82 L. Ed. 1461, 58 Sup. Ct. 1019, 146 A.L.R. 357 (1937); *In re Snyder v. Maxwell,* 66 Wn.2d 115, 401 P.2d 349 (1965); *In re Ritchie v. Rhay,* 63 Wn.2d 508, 387 P.2d 967 (1963); *State v. Angevine,* 62 Wn.2d 980, 385 P.2d 329 (1963); *State v. Self,* 59 Wn.2d 62, 366 P.2d 193 (1961).

Here, as throughout the trial, appellant's counsel inject the recurring theme that because on September 21, 1962, the appellant had been committed to a mental hospital for examination, it must be presumed that he was mentally incompetent at all times thereafter and, hence, incapable of waiving his constitutional rights. We have heretofore indicated our disagreement with this premise. His own participation in the hearing on the admissibility of the confession indicates rather clearly that he was not mentally incompetent either at the time of the hearing or at the time of the confession.

We conclude that it was entirely proper for Captain White to testify as to the confession made by the appellant to him.

The final contention made on behalf of the appellant is that the two verdicts were inconsistent. As heretofore indicated, the appellant was found not guilty of the murder of Fred Walch by reason of insanity or mental irresponsibility, and found guilty of the murder of Bonnie Walch with a recommendation of the death penalty.

The claimed inconsistency can be satisfactorily explained.

The evidence does not establish the exact time (between 7:30 p.m. and 11 p.m.) of the death of Fred Walch, but the evidence makes it clear that it was a considerable time before the death of Bonnie, who did not return home until

after 11 p.m. on December 10. Her body was still warm when examined by the officers; but this was not so with Fred's body.

The appellant's statement to his psychiatrist, Dr. Campbell, concerning the drugs he had taken that evening—including the peyote buttons which he had not before used—are most significant. Dr. Campbell regards them as explaining the sudden compulsion to kill Fred when the latter accused appellant of making a whore out of Mrs. Walch and struck at him. To give a clearer picture of the situation prior to the attack on Fred, we quote Dr. Campbell who testified that after the appellant determined that Mrs. Walch had lied to him about where she was going when she and Bonnie left the house at 7:30 p.m. on the fatal evening, he became disturbed and upset.

> [H]e drank a number of drugs. These drugs were a cough syrup, which is called Tussar, and which contains a narcotic-like substance, stating that he took the entire bottle of this medication. That he also took some yellow jackets, which are nembutal capsules and have a sedative effect, or a stupifying effect, they are part barbituate. He took some—what he called Amps, which I took to mean as ampules of some substance the exact composition of which he did not know, and which I have not been able to discover. This he poured into coffee which he was drinking he stated many times that night, and then he ate five peyote buttons. These are medical buttons, or buttons from cactus, and are commonly used by the Indians of our Southwestern states to put them into a psychotic stupifying, or hallucinating state, as part of, I believe, their religious ritual. The action of this drug lasts only a few hours. He then told me that the older children returned, and that they reviled him for making a whore of their mother, and that he impulsively attacked the boy, killing him with the hammer, and later the girl in the same way. I questioned him regarding the use of a knife, which had been reported to me, and he had no recollection whatever of using a knife. His recollections were very difficult to elicit, and they were clouded. I felt that his actions were poorly considered, impulsive, and that his entire conduct was quite erratic at the time. And it's my opinion that his actions on this night were the

result of a toxic state primarily in which judgment was lacking and impulsivity was controlling his behavior, and with his basically violent and sociopathic nature it would have been very difficult for him to withhold from these assaults. His actions can also be considered as being the result of a short-lived toxic condition, that is, a condition in which his mind was poisoned. His clouded mental state was inadequate in the control of his behavior.

The jury may well have believed that under the influence of the drugs and angered by the boy's statements, that appellant, at the moment of the attack on Fred Walch, did not have the "capacity to distinguish between right and wrong."

This was the test which the jury was instructed to apply in determining whether or not the appellant was legally insane or mentally irresponsible at the time of the killing. This is the M'Naghten rule which has always been the test applied in this state and which has not been challenged in this case. *State v. White,* 60 Wn.2d 551, 374 P.2d 942 (1962); *State v. Collins,* 50 Wn.2d 740, 314 P.2d 660 (1957).

It will be noted, in his statement to Dr. Campbell, that appellant has the "older children (Bonnie and Fred)" returning together and reviling him. We know that they did not return together. Fred was home when his mother and Bonnie left, and Bonnie did not return until after 11 p.m.

The jury might well have believed that appellant's state of mind changed during the time that intervened between the killing of Fred and Bonnie's homecoming. During that time he removed his bloodstained clothes and reclothed himself. He drank a considerable amount of coffee. Dr. Campbell's testimony was that the effect of the peyote buttons "lasts only a few hours."

All this would explain the jury's obvious conclusion that the insane compulsion which had possessed him when he attacked Fred some time after 7:30 p.m., had passed before Bonnie returned some time after 11 p.m., and that when he killed her because she "started screaming when she saw her brother there," he was fully conscious of the difference between right and wrong.

The jury could accept his explanation (through his psychiatrist) of a sudden compulsive action culminating in a homicide, and not accept his explanation of another such action at a considerably later time.

Buttressing the jury's belief that appellant knew right from wrong when he killed Bonnie, is another change of clothes after Bonnie's death and his cleaning the butcher knife (exhibit No. 2), if it was the murder weapon, or the disposal of that weapon. His conversation with Mrs. Walch after 1 a.m. on December 11, evidenced a knowledge of what he had done. His throwing away a knife as he commenced his flight; his stealing a car and making it operable without a key, and his subsequent actions all bespeak the conduct of a man who knew what he had done and that it was wrong.

On careful analysis of the evidence before the jury there is a rational and logical explanation of the seeming inconsistency. The sequence of the occurrence of each of the alleged offenses was clear. Each murder with which the appellant was charged constituted a separate count, and the proof on each count was of different acts alleged to have been committed by him. The modus operandi was the same, but the state of mind, *i.e.*, the ability to distinguish right from wrong, may well have been different.

There was a factual basis upon which the jury could have acquitted the appellant on one charge and convicted him on another. Under such circumstances there is no inconsistency. *State v. Allen,* 66 Wn.2d 641, 404 P.2d 18 (1965); *State v. Fairfax,* 42 Wn.2d 777, 258 P.2d 1212 (1953). See also *State v. Baird,* 200 Wash. 227, 93 P.2d 409 (1939).

We are satisfied that the appellant had a fair trial, and that there is no prejudicial error in the record. The judgment of conviction and the sentence appealed from are affirmed.

ALL CONCUR.

---

June 26, 1967. Petition for rehearing denied.