[No. 39402. En Banc. September 11, 1969.]

THE STATE OF WASHINGTON, *Respondent*, v. JERRY RALPH ADAMS, *Appellant*.*

*Reported in 458 P.2d 558.

J. *Lael Simmons* and *John R. Simmons*, for appellant (appointed counsel for appeal).

*Robert E. Schillberg, Merle E. Wilcox, Donald J. Hale,* and *Bruce A. Keithly,* for respondent.

NEILL, J.—This is an appeal from a conviction of first degree murder. The jury returned a recommendation for

the death penalty which was pronounced as the sentence. The evidence is entirely circumstantial. The sufficiency of the evidence is challenged by the defendant; so we deem it necessary to set forth considerable factual detail.

The victim's body was discovered in her home by her daughter about midnight Saturday, June 11, 1966. The daughter immediately summoned the police. Police investigation revealed that the victim died as a result of a number of blows to the head inflicted with a blunt object, believed to be a claw hammer found near her body. The handle was wrapped with a cloth.

The time of the death was not definitely established. Testimony of several witnesses established that the victim was alive the preceding Thursday evening. One doctor testified that the victim died between noon on Thursday and noon on Saturday. Another doctor testified that her death occurred between 6 p.m. and 10 p.m. on Saturday, and that death occurred within a few hours after the victim had eaten a meal.

The victim's automobile was missing when the daughter discovered the body. The victim's neighbor heard a woman scream at about 10 o'clock Friday night. At about 11 p.m. of the same night the same neighbor saw the victim's automobile being driven away. Another witness testified that she saw defendant driving the victim's automobile about 10:30 or 11 o'clock Friday evening. Defendant was seen by numerous witnesses driving the victim's automobile on Saturday and Sunday. Some of these witnesses accompanied defendant on his excursions in the victim's automobile around the Seattle area. During this time, defendant gave these witnesses various explanations as to how he had acquired the automobile. He generally claimed ownership of it.

Defendant abandoned the automobile on Sunday upon hearing on the radio that the victim's body had been discovered. Several days later he was apprehended by the police following a high speed chase. He sustained minor injuries in his effort to avoid capture.

During the period from Friday night to Sunday, defend-

ant was wearing clothing belonging to the victim's son. A suit of clothes which defendant admitted was his was found in the victim's home. Minute spots of blood were found on the clothes left at the home. Defendant's fingerprints were found in the victim's home, particularly on a suitcase containing the victim's papers. The key to this suitcase was found in the victim's automobile. The victim's son testified that he had never loaned his clothes to defendant and that his mother had never loaned his clothes to anyone. The son and daughter also testified that the victim would never loan her automobile to anyone except members of the family.

Defendant testified. He admitted that he had visited the victim's home Friday evening. He further stated that the victim had loaned her automobile and the clothes to him, and that he had not killed her. A young neighbor boy testified that he had seen the victim pick up her mail from in front of her house on Saturday; however, the postman testified that the mail delivered Saturday had not been removed from her mail box.

■ The first issue raised by defendant's appeal is whether the court erred in admitting into evidence certain colored photographs (slides) taken during the autopsy. He contends that the only reason to show the slides was to inflame the jury with the sight of cruel injuries so as to overwhelm reason and to associate the accused with the atrocity without sufficient evidence. Pictures that accurately represent the true state or condition of the thing depicted are admissible if they have probative value upon some element of the crime charged. *State v. Hawkins,* 70 Wn.2d 697, 425 P.2d 390 (1967). They have been held to have probative value where they were used to illustrate or explain the testimony of experts such as doctors. *State v. Little,* 57 Wn.2d 516, 358 P.2d 120 (1961); *State v. Nyland,* 47 Wn.2d 240, 287 P.2d 345 (1955); *State v. Smith,* 196 Wash. 534, 83 P.2d 749 (1938).

The fact that photographs are taken at a location other than the scene of the crime (*e.g.,* the morgue) does not

affect their admissibility. *State v. Little, supra* (photographs at autopsy); *State v. Nyland, supra* (photographs at morgue). Photographs which do not depict the corpse as it looked immediately after the crime may be admissible if they have probative value. *State v. Little, supra* (photographs amplified testimony concerning cause of death, not condition of body); *State v. Smith, supra* (photographs of body 4 months after burial explained testimony concerning cause of death). The fact that the unpleasant aspects of the photographs are in part the result of the autopsy rather than the criminal act which caused death does not necessarily preclude the use of the photographs. *See State v. Hardamon,* 29 Wn.2d 182, 186 P.2d 634 (1947) (photograph of bandaged head of complaining witness); *State v. Smith, supra* (photograph of body 4 months after burial).

Photographs are not inadmissible merely because they are gruesome. *State v. Griffith,* 52 Wn.2d 721, 328 P.2d 897 (1958). Further, in *State v. Payne,* 25 Wn.2d 407, 171 P.2d 227, 175 P.2d 494 (1946), we observed that a qualification of these rules based solely upon the degree of unpleasantness would only add confusion and uncertainty to the law.

However, these rules are subject to a widely recognized reservation that gruesome photographs designed primarily or solely to arouse the passions of the jury and to prejudice the defendant are not admissible. "The test of admissibility in such cases is whether the probative value of the photographs outweighs their probable prejudical effect." 23 C.J.S. *Criminal Law* § 852(1), 353 (1961). *See People v. Cheary,* 48 Cal.2d 301, 309 P.2d 431 (1957); *State v. Bucanis,* 26 N.J. 45, 138 A.2d 739, 73 A.L.R.2d 760 (1958); *State v. Morris,* 245 La. 175, 157 So.2d 728 (1963); *Evidence —Photograph of Corpse,* Annot. 73 A.L.R.2d 769, 787-807 (1960). *State v. Bucanis, supra,* contains a particularly apt statement of the rule at 53:

> The fact that a photograph may have some probative force is not always completely determinative of its admissibility. There are cases where the logical relevance of such an exhibit will unquestionably be overwhelmed by its inherently prejudicial qualities which will impair

the defendant's right to a fair and impartial trial. When undoubtedly the minute peg of relevancy will be entirely obscured by the quantity of dirty linen hung upon it, fair play directs the exclusion of the exhibit.

■ This balancing of the relevancy and probative value of photographic evidence against its harmful effect upon an accused rests primarily with the trial court. *State v. King*, 71 Wn.2d 573, 429 P.2d 914 (1967). But this rule does not relieve us of the obligation to review the exercise of this discretion and to grant a criminal defendant a new trial if this court is convinced that there has been an abuse of that discretion. This is a situation where the policy of protecting a defendant from undue prejudice conflicts with the rule of logical relevance. A proper determination as to which should prevail rests in the sound discretion of the trial court, and not merely on whether the evidence comes within certain categories. *State v. King, supra; State v. Johnson*, 56 Wn.2d 700, 355 P.2d 13 (1960).

The slides used in the case at bar were assuredly gruesome. However, we cannot change the fact that this was a gruesome crime. As much as courts should and do keep a trial clear of potentially prejudicial matter, this obligation, within our concept of a fair trial for an accused, must be applied with the realities of the facts which the state is required to prove. A bloody, brutal crime cannot be explained to a jury in a lily-white manner to save the members of the jury the discomforture of hearing and seeing the results of such criminal activity. Each slide shown had considerable probative value to prove relevant and material issues in the case.

In cases involving violent crimes, particularly unwitnessed murders, the testimony of the doctor performing the autopsy is often crucial in establishing relevant and material facts. As the expert testified in the instant case, doctors performing autopsies often photograph the various stages of their examinations, and such photographs are quite helpful and necessary for a jury of laymen to understand the doctor's testimony. The autopsy surgeon's testimony, in

conjunction with which the slides were shown, was important in establishing certain material facts: (1) the exact cause of death; (2) the nature and location of the wounds; (3) the similarity between the hammer in evidence and the type of instrument which inflicted the wounds; and (4) that the victim was attacked from behind and apparently did not attempt to or have the opportunity to defend herself.

The slides were used to illustrate the doctor's explanation of his opinion as to the cause of death, type of instrument used and to show that the victim's black eyes were the result of a blow to the back of the head and not to the eyes directly. This testimony has probative value to substantiate the state's theory that the victim was struck from the rear as she fled from her assailant.

Defense counsel vigorously opposed the admission of these slides. He argued that the witness had not testified that the slides were necessary to an understanding of his proposed testimony. Therefore, in answer to a question by the court, sans jury, the witness stated, "I would consider it most helpful [to use the slides]."

Although it does not appear from the record that the trial judge previewed these slides, we cannot say that he failed to exercise his discretion because, upon a motion for mistrial, he stated:

> Well, counsel, I am going to deny your motion. Violent death is never a nice thing to observe, but this is what we are doing here today. We are attempting to find out what the cause of death was, it was a violent death, and who caused the death, and I don't see anything in these illustrations of testimony by the Doctor that is going to prejudice this jury one way or the other. It is not going to make the death less violent, and I can't possibly see, under the theory of the case which you have here, why this should be prejudicial in any sense of the word.

In a criminal case a plea of not guilty puts all elements of the crime in issue and the state must prove them beyond a reasonable doubt. *State v. Davis*, 6 Wn.2d 696, 108 P.2d 641 (1940). In presenting its case, the state cannot anticipate that the defense will admit anything. Accord-

ingly, the proof relative to the corpus delicti was not only essential, it was properly used by the state in its case in chief. Defendant's argument that the fact of death was clear and that such death was caused by a criminal act and agency was otherwise proved will not deprive the state of its obligation of proof of these elements by the best means available to it. The slides had clear and relevant probative value. The ruling by the court was not an abuse of its discretion.

The imposition of the death penalty creates a temptation, but not justification, for this court to find reversible error where it would not do so in criminal cases in which a lesser penalty is imposed. But reversing the case at bar on the basis of the first assignment of error would be to substitute our judgment for that of the trial court in a discretionary ruling and could result in unduly hampering the use of an important evidentiary method in future criminal cases. This we decline to do even though we might have ruled otherwise as to several of the photographs.

Defendant also assigns error to the admission into evidence of photographs which show the victim's body and the interior of her home as discovered by the police during their investigation. Defendant failed to direct any arguments in his brief toward this assignment of error and it should be considered waived. *Seattle v. Schaffer,* 71 Wn.2d 600, 430 P.2d 183 (1967); *State v. Bell,* 59 Wn.2d 338, 368 P.2d 177 (1962). However, we have considered the contention as there is overlapping with the first assignment of error. These photographs had clear probative value and were admissible under the rules stated above. They were used to prove relevant and material facts such as the scene of the crime and the physical facts of the case. The potential prejudicial effect of these photographs does not appear to be great and does not outweigh their probative value. The court did not abuse its discretion in admitting them into evidence.

Defendant next assigns error to the court's refusal to exclude all witnesses, some 50 in number, from the court-

room except when they were actually testifying. Defendant admits there is no requirement that the court exclude witnesses, but contends there was no sound reason for not doing so in a capital case when a request is made. He further argues that when a conviction and death sentence ensue, it is reasonable to assume that denying his motion to exclude witnesses was prejudicial and indicates an abuse of discretion by the trial court.

■ It is a well established rule in this jurisdiction that the exclusion of the state's witnesses is within the discretion of the trial court and the court's decision will not be overturned unless the defendant can show that he has been prejudiced by an abuse of discretion. *State v. Weaver,* 60 Wn.2d 87, 371 P.2d 1006 (1962); *State v. Dalton,* 43 Wash. 278, 86 P. 590 (1906). The trial judge refused to exclude all witnesses stating that he did not believe that this was the type of case in which witnesses would rely on the testimony of preceding witnesses; that defendant had not shown the necessity for excluding witnesses; and the courthouse facilities were inadequate to accommodate the many witnesses if they were excluded from the courtroom.

After stating his reasons for denying the motion to exclude the witnesses, the trial judge stated: "Unless you have some good reason to gainsay me here, I will deny your motion, but I am willing to listen." Defense counsel merely stated that his feelings were just the opposite from those expressed by the court and failed to give the court any specific reason or justification for applying the exclusion rule. Although a motion to exclude witnesses should usually be granted, we cannot hold that under these circumstances there was an abuse of discretion.

Defendant next contends that he was denied a fair and impartial trial by reason of the improper, inflammatory and prejudicial remarks of the prosecutor during summation. In closing argument, the prosecutor charged the defendant some 32 times with being a liar and characterized him as a murderer and a killer of the most dangerous kind. Thus, defendant contends, the prosecutor expressed his personal

belief and opinion both as to the veracity of the defendant as well as to his guilt.

Defendant did not object to such remarks, but contends that his failure to do so is not fatal to his appeal since the prosecutor's conduct was so flagrant and prejudicial that an instruction could not have cured the situation.

It is established that the constitutionally guaranteed fair trial requires a trial in which the attorney representing the state does not throw the prestige of his public office and the expression of his own opinion of guilt into the scales against the accused. Thus, any attempt to impress upon the jury the prosecuting attorney's personal belief in the defendant's guilt is unethical and prejudicial. *See State v. Case*, 49 Wn.2d 66, 298 P.2d 500 (1956), and cases cited therein. Argument of counsel must be confined to the evidence and to fair and reasonable deductions to be drawn therefrom.

The prosecutor, in his closing argument, did refer to defendant as a liar on a number of occasions. However, each time he did so he referred to a specific portion of the evidence, including defendant's own testimony, which clearly demonstrated that in fact defendant had lied. The prosecutor, in essence, argued that (1) the evidence shows that defendant has lied before when there was little reason to do so; (2) defendant now has good reason to lie; (3) you may consider a witness' interest in the case in evaluating the witness' credibility; and (4) it is therefore reasonable to believe that defendant is not telling the truth now. Counsel is given reasonable latitude to draw and express inferences and deductions from the evidence, including inferences as to the credibility of witnesses. *State v. Hinkley*, 52 Wn.2d 415, 325 P.2d 889 (1958); *State v. Brown*, 35 Wn.2d 379, 213 P.2d 305 (1949).

Although the prosecutor's closing argument might have been better phrased by not using the word "liar", we believe that his argument comes within the rule which allows counsel to draw and express reasonable inferences from the evidence produced at trial.

Similarly, the prosecution's reference to defendant as a killer of the most dangerous kind was based on the evidence and was made as part of the state's argument for the imposition of the death penalty. The quotations from the following cases seem particularly appropriate on this point: ·

It may be that, in a case where these terms ["murderer" and "red-handed murderer"] would be inappropriate to the charge against the defendant, in a case where there was no justification for their use, and the attorney applied them to the defendant as mere epithets, the court would be warranted in saying that he went beyond the bounds of legitimate argument to the prejudice of the defendant. But this is not such a case. The charge was murder. The evidence on the part of the state tended very strongly to show that the appellant was guilty of the charge. There was evidence, also, from which the jury could well find that the blood of his victim was upon his person and clothing at the time of his arrest. The conclusion that the appellant was a "murderer" and a "red-handed murderer" was one that could be legitimately drawn from the evidence. It is not an instance where the attorney went beyond the evidence and made statements of his beliefs and opinions, unwarranted and unsupported by evidence. It is this latter sort of statements that the courts usually condemn, not those which the evidence reasonably supports.

*State v. Evans*, 145 Wash. 4, 17, 258 P. 845 (1927).

It may, for example, be highly prejudicial to speak of a defendant as "a red-handed murderer," upon one set of facts, and merely bad taste, on another. It is because the question as to whether or not the language complained of is prejudicial depends primarily upon the evidence in the case that we have been compelled, in preparing this opinion, to make a long and tedious recital of the evidence. However, certain general principles may be deduced from the decisions considered as a whole.

If the evidence indicates that the defendant is a murderer or killer, it is not prejudicial to so designate him.

*State v. Buttry*, 199 Wash. 228, 249, 90 P.2d 1026 (1939).

"The best rule for determining whether remarks made by counsel in criminal cases are so objectionable as to cause a reversal of the case is, Do the remarks call to the

attention of the jurors matters which they would not be justified in considering in determining their verdict, and were they, under the circumstances of the particular case, probably influenced by these remarks."

*State v. Buttry, supra,* at 251, quoting from *Sullivan v. State,* 47 Ariz. 224, 55 P.2d 312 (1936).

While the prosecutor's language designating defendant as a dangerous killer may have been in bad taste and not to be favored, nevertheless under the holdings quoted above the statement did not constitute prejudicial and reversible error.

Defendant next, contends that his constitutional rights were violated in that after his arrest he was interrogated in the absence of his counsel by police officers who knew the defendant had counsel. Admissions of defendant made during such interrogations were used against him. Because of the important constitutional questions raised in this assignment of error, we must relate in some detail much of the circumstances which preceded the trial.

On June 18, 1966, defendant was apprehended by two police officers who had been given a description of defendant, his clothes, and the vehicle he was driving. He attempted to avoid arrest by fleeing on a motorcycle. As a result of minor injuries received in a crash at the conclusion of a chase, he was taken to Harborview Hospital in Seattle. It was there determined that he was not in need of hospital care. Aspirin was the only medication given to defendant during the 24 hours prior to his removal from the hospital.

At 9:42 a.m. on June 19th, defendant was taken into police custody at the hospital, at which time he was fully advised of all his constitutional rights. He was thereupon transferred to Mountlake Terrace.

Defendant was then given a written statement of rights, which he completed by filling in certain blanks, read aloud, acknowledged and signed in the presence of two police officers. Prior to signing the statement of rights, defendant indicated that he was represented by an attorney with whom he had already been in contact. He did not request to

contact this attorney before signing the statement. The police did not contact the attorney themselves. No threats or promises were made to induce defendant to sign the document. The chief of police issued departmental instructions that members of defendant's family could visit him. Defendant was advised to keep in his possession a slip of paper containing his attorney's name and telephone number, was shown a telephone and advised that he could use it upon request.

Shortly before 9 p.m. the same day, defendant was taken before Judge Kershner in the municipal courtroom of Mountlake Terrace, at which time three police officers and a deputy prosecutor were present. The court then informed defendant of the charges against him and again advised him of his rights. Defendant again stated that he had an attorney but would be getting another one. The court advised defendant that the state would provide him with an attorney at the state's expense. Defendant indicated that he understood and that he had no questions. Defendant did not request that his attorney be present at this court appearance. The attorney was not notified of the hearing.

Defendant was returned to the police station and the first interrogation began at 9:03 p.m. Defendant was first asked if he recognized a pair of jeans, a belt and a shirt all found by the police at the home of the victim. In response to this question, defendant replied that he would rather not say. Defendant was then asked questions concerning his visits to the victim's home in the recent past, his relationship with her and her son, and his interest in a 1957 Chevrolet belonging to the victim. He freely answered each of these questions.

Defendant was then taken to the police garage and asked whether he recognized a 1964 Pontiac belonging to the victim. Defendant replied that he would rather not say. Defendant was asked whether the clothes he was wearing at the time of his arrest belonged to him and he replied that he would rather not say. Defendant was then asked questions concerning his employment and educational background, which questions defendant freely answered.

The interrogation ceased and defendant was returned to his cell at 9:35 p.m., 32 minutes after the interrogation had begun. The three questions which defendant had declined to answer were not asked again by the police during this interrogation session. Defendant did not request that the interrogation cease. He did not request the presence of his attorney. His attorney was not contacted by the police. No threats or promises were made to induce defendant to answer any of the questions during this interrogation.

On June 20th, defendant was taken before Judge French in the Everett court at which time he was again advised of his rights, including his right to appointed counsel. Defendant repeated that he already had an attorney. He did not request that his attorney be present at this court appearance and his attorney was not contacted by the authorities. The court then continued the matter for the setting of the preliminary hearing to June 22d, and defendant was returned to his cell.

On June 22d, at 11:20 a.m., defendant was again interrogated by two police officers. Defendant was asked questions concerning his previous ownership of automobiles, his work at a restaurant, and his activities beginning from his last day of work on June 9th up to the late afternoon of June 10th at which time defendant was visiting his sister at a beauty parlor in the area of the victim's home. He answered each of these questions freely. He was then asked where he went when he left the beauty parlor. Defendant responded that he would rather not answer until he had consulted with his attorney. The interrogation then ended. The total interrogation time was some 50 minutes. Defendant did not request that his counsel be present during this interrogation and the authorites did not contact his attorney. No promises or threats were made to induce defendant to answer the questions put to him.

At 11:40 a.m. on June 24th, defendant was interrogated for a third time by a police officer for a period of 23 minutes. He was asked questions concerning his activities between his last day at work on June 9th and the time he appeared at the beauty parlor on the afternoon of June

10th. He answered these questions freely. Defendant was then asked where he went upon leaving the beauty parlor. He answered that he would rather not say. Defendant was then asked questions concerning his visits with the victim. These questions were answered freely. The interrogation then ceased. No threats or promises were made to induce defendant to answer any of the questions. Defendant did not request that his attorney be present during this interrogation and the attorney was not contacted by the police.

No requests by defendant to see his attorney or his family were denied. Between the second and third interrogations, June 22d and June 24th, defendant received visits from his attorney, his family and a psychiatrist. After the third interrogation, he was transferred to the Snohomish County jail.

Prior to the introduction of the testimony of the police officers relating the statements made by defendant at these interrogations, a hearing was conducted by the court as provided by CrR 101.20W. The trial court found the statements of defendant to be voluntary and admissible, but ordered the state to refrain from introducing any statements of the defendant concerning his refusal to answer any question.

Relying on *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966); *Escobedo v. Illinois,* 378 U.S. 478, 12 L. Ed. 2d 977, 84 S. Ct. 1758 (1964); and *Massiah v. United States,* 377 U.S. 201, 12 L. Ed. 2d 246, 84 S. Ct. 1199 (1964); and citing *Malinski v. New York,* 324 U.S. 401, 89 L. Ed. 1029, 65 S. Ct. 781 (1945), and *Glasser v. United States,* 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457 (1941), defendant contends that the above related facts establish two grounds for holding the defendant's statements inadmissible: (1) because they knew defendant was represented by counsel, the police had an obligation to contact that attorney prior to their taking defendant before a judge on two occasions and interrogating him on three occasions; and (2) once defendant indicated that he did not wish to answer one particular question asked in a series of ques-

tions, the police had a duty to immediately stop the interrogation and not question defendant at any future time. We do not believe, however, that defendant's contentions are supported either by the facts of the case or the decisions on which he relies.

■ The cases cited by defendant reaffirm certain constitutional rights of a person accused of crime, including the right to remain silent and the right to be represented by counsel at all critical stages. However, these decisions also permit the accused to waive these rights. The defendant in a criminal proceeding may choose to be represented at all critical stages of the proceeding, at only some stages, or at no time during the proceeding. Similarly, the defendant may choose not to answer questions or otherwise incriminate himself, to answer some but not all questions, or to answer all questions and make a full confession. Courts will generally recognize the defendant's choice provided it is made knowingly, intelligently and voluntarily.

In *Massiah v. United States, supra,* the Supreme Court held that a defendant was denied the protection of the Sixth Amendment guarantee of the right to counsel when evidence was admitted of incriminating statements elicited from him after indictment and in absence of counsel. The court, at 205, quoted with approval from *People v. Waterman,* 9 N.Y.2d 561, 565, 175 N.E.2d 445 (1961):

"Any secret interrogation of the defendant, from and after the finding of the indictment, without the protection afforded by the presence of counsel, contravenes the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with crime."

Although in this case no indictment or information was on file at the time the interrogations took place, defendant contends that the Supreme Court has now recognized that "It would exalt form over substance to make the right to counsel . . . depend on whether at the time of the interrogation, the authorities had secured a formal indictment." *Escobedo v. Illinois, supra,* at 486. Following this argument to its logical conclusion, defendant would have us

conclude that once the process shifts from investigatory to accusatory, and the accused has a lawyer, then no interrogation could take place unless in the presence of counsel.[1]

The Supreme Court decisions in *Miranda* and *Escobedo* do not require the conclusion that, once an accused has counsel, he cannot waive the right to have counsel present at interrogation. In *Massiah,* the defendant was unaware that he was being interrogated; therefore, he could not have knowingly or intelligently waived his right to counsel. The issue of waiver was thus not there presented to the court. The holding in *Escobedo* is restricted by the facts of that case. The court held at 490:

> We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied "the Assistance of Counsel" in violation of the Sixth Amendment . . .

Here defendant did not request that counsel be present during the interrogations, although he was informed of this right upon several occasions. Courts of other jurisdictions have held in pre-*Miranda* decisions that an accused without counsel may waive his right to counsel under *Escobedo* by failing to request counsel before or during interrogation. See *e.g., Dayton v. Gladden,* 394 F.2d 4 (9th Cir. 1968); *State v. Fox,* 251 La. 464, 205 So. 2d 42 (1967); *Greenwald v. State,* 35 Wis. 2d 146, 150 N.W.2d 507 (1967). See also our own departmental decision *State v. Huston,* 71 Wn.2d

---

[1] New York may now follow such a rule. See *People v. Vella,* 21 N.Y.2d 249, 287 N.Y.S.2d 369, 234 N.E.2d 422 (1967); *People v. Donovan,* 13 N.Y.2d 148, 193 N.E.2d 628 (1963); *People v. Waterman,* 9 N.Y.2d 561, 175 N.E.2d 445 (1961); *People v. DiBiasi,* 7 N.Y.2d 544, 200 N.Y.S.2d 21, 166 N.E.2d 825 (1960). Other jurisdictions also support this proposition. See *State v. Witt,* 422 S.W.2d 304 (Mo. 1967); *State v. Herman,* 3 Ariz. App. 323, 414 P.2d 172 (1966).

226, 428 P.2d 547 (1967). It has also been held in a pre-*Miranda* decision that an accused with counsel could waive the right to have counsel present during interrogation. *Moore v. State,* 436 P.2d 236 (Okla. Crim. App. 1968).

The argument of defendant along this line also overlooks the impact of *Miranda* upon *Escobedo* and *Massiah.* The court in *Miranda* definitely recognized the possibility that a defendant may waive his right to counsel at 444: "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." Although it may be contended that *Miranda* is solely a Fifth Amendment case, and its holdings upon the right to have counsel present are relevant only to the "voluntariness" of incriminating statements and have no impact upon the Sixth Amendment cases this argument overlooks the specific references to *Escobedo* in the *Miranda* opinion. The court in *Miranda* discussed the Fifth Amendment implications of *Escobedo,* which was, by its terms, a Sixth Amendment decision, at 465:

> Our holding there [in *Escobedo*] stressed the fact that the police had not advised the defendant of his constitutional privilege to remain silent at the outset of the interrogation, and we drew attention to that fact at several points in the decision . . . This was no isolated factor, but an essential ingredient in our decision. . . .
>
> A different phase of the *Escobedo* decision was significant in its attention to the absence of counsel during the questioning. There, as in the cases today, we sought a protective device to dispel the compelling atmosphere of the interrogation. In *Escobedo,* however, the police did not relieve the defendant of the anxieties which they had created in the interrogation rooms. Rather, they denied his request for the assistance of counsel . . . This heightened his dilemma, and made his later statements the product of this compulsion. [Citation omitted.] The denial of the defendant's request for his attorney thus undermined his ability to exercise the privilege—to remain silent if he chose or to speak without any intimidation, blatant or subtle.

(Footnote omitted.)

The court also emphasized the importance of *Escobedo* in

more traditional Sixth Amendment terms, stressing "the protection of rights at trial." (*Miranda,* 384 U.S. at 466.) It is thus apparent that an accused's right to counsel while in custody not only guarantees his Sixth Amendment right to counsel, but also protects the Fifth Amendment rights of due process and privilege against self-incrimination. These protections are so interwoven that any attempt to separate the Sixth Amendment right to counsel and a Fifth Amendment right to counsel, and to assign different standards of waiver to each, would be a meaningless and futile exercise.

The decision in *Miranda,* which recognizes that the right to counsel may be voluntarily and intelligently waived, is not limited by the court's prior decisions in *Massiah* and *Escobedo.* This was impliedly recognized in a Florida decision which held that the right to have counsel present at interrogation could be waived *after indictment. Colebrook v. State,* 205 So.2d 675 (Fla. 1968). In a case similar to that now before us, where the accused already had counsel, the Tenth Circuit held that the right to have counsel present at interrogation could be waived. *Dillon v. United States,* 391 F.2d 433 (10th Cir. 1968). The court stated at 436:

> It is further contended by Dillon that after counsel had been retained for him the F.B.I. agent interviewed him without his counsel being present and this procedure tainted the admissions. We do not agree. The fact that Dillon's counsel was not present at the time the admissions were confirmed does not ipso factor render them inadmissible. [Citation omitted.] The presence of counsel can be waived as well as demanded. Certainly, if an accused can waive the right to counsel when that right first attaches [citations omitted], he can waive the right to have counsel present subsequent to counsel's appointment or retainment. The concern in each instance is that the waiver be intelligently made.

The Supreme Court's decision in *Miranda* thus recognizes that an accused who has counsel and who has been adequately warned may waive his right to have counsel present at interrogation; however, the prosecution must establish any purported waiver in accordance with the standards set forth at 475:

[A] heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. . . .

An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained.

Justice Harlan, dissenting in *Miranda*, assumes that this requires an "express" or affirmative waiver by the accused before a waiver will be effective. However, a number of courts in recent post-*Miranda* cases have held that a waiver of the right to remain silent and the right to counsel may be effective without an affirmative statement by the accused. *See Alexander v. United States*, 380 F.2d 33 (8th Cir. 1967); *United States v. Hayes*, 385 F.2d 375 (4th Cir. 1967); *Henry v. State*, 209 So.2d 614 (Miss. 1968); *Colebrook v. State, supra; State v. Escamilla*, 182 Neb. 466, 155 N.W.2d 344 (1968); *Childs v. State*, 243 Ark. 62, 418 S.W.2d 793 (1967); *State v. LaFernier*, 37 Wis. 2d 365, 155 N.W.2d 93 (1967). *But see Sullins v. United States*, 389 F.2d 985 (10th Cir. 1968), where some affirmative form of waiver was apparently required. The Fourth Circuit, when faced with the contention that an affirmative statement by the accused is required for an effective waiver, replied (*United States v. Hayes, supra,* at 377):

Thus, we cannot accept appellant's suggestion that because he did not make a statement—written or oral—that he fully understood and voluntarily waived his rights after admittedly receiving the appropriate warnings, his subsequent answers were automatically rendered inadmissible. Of course, the attendant facts must show clearly and convincingly that he did relinquish his constitutional rights knowingly, intelligently and voluntarily, but a statement by the defendant to that effect is not an essential link in the chain of proof.

Defendant did not expressly state that he wished to waive his rights. Although there is increasing sentiment in

this court to adopt the rule expressed in *People v. Vella,* 21 N.Y.2d 249, 287 N.Y.S.2d 369, 234 N.E.2d 422 (1967), we conclude here that a finding of an express statement by the accused that he wishes to waive one or more of his rights is not necessary before there can be an effective waiver of his rights to remain silent and to have counsel present during interrogation. The circumstances under which a statement is made, of course, must clearly show that it was made voluntarily, knowingly, and intelligently with full awareness by the accused of his rights.

The Supreme Court has not required an express statement by the accused for an effective waiver, but rather has forbidden the presumption that an intelligent waiver was made simply from the fact that a statement was eventually extricated from the accused after he was warned of his rights. Some additional showing is required that the inherently coercive atmosphere of custodial interrogation has not disabled the accused from making a free and rational choice.

Here, defendant was repeatedly warned of his rights. He was given a written statement of all the warnings required by *Miranda* including the right to have counsel present during interrogation, and he was asked to read it aloud to insure that he would understand it. The interrogation sessions were short. There is no showing of trickery or cajolery. He had free access at all times to a telephone. He visited with his attorney, members of his family, and his doctor between interrogation sessions. He made no request that his attorney be present during the interrogation sessions. He was not under medication. Finally, and most importantly, on at least five occasions throughout all three interrogation sessions, defendant declined to answer certain questions, thus selectively exercising his right to remain silent. Defendant's exercise of his constitutional right to remain silent as to certain areas of questioning throughout the interrogation sessions is persuasive evidence of his continuing ability to make a free and rational choice, and lends strong support to the conclusion that any other rights he

declined to exercise during the interrogation sessions were knowingly and intelligently waived. In a somewhat similar situation in *United States v. Hayes, supra,* the court stated at 378:

> When he immediately thereafter sought leave to telephone someone, leave was granted. As soon as he indicated a wish that the questioning be terminated and that he be allowed to consult an attorney, the F.B.I. agents complied with his request. That he had the presence of mind and the liberty to make a phone call and to demand an attorney shortly after receiving the requisite warnings strongly supports the inference that Hayes understood the warnings and voluntarily relinquished his rights.

We have examined the record fully in light of our duty to ascertain the voluntariness of the admission elicited from defendant (*State v. Davis,* 73 Wn.2d 271, 438 P.2d 185 (1968)). We are satisfied that defendant was fully and properly advised of all his constitutional rights, including the right to have his attorney present at interrogations. He fully understood these rights. He was not prevented, by threats, promises, cajoling, or other means, from exercising these rights. He freely answered many questions, refrained from answering others, and selectively suggested he desired his counsel to be present as to some, whereupon interrogation on such matters terminated. Under these circumstances, the defendant has waived his right to have counsel present during interrogation and his right to remain silent.

Defendant's second contention is that once he declined to answer any particular question during the interrogation session, the police should have ceased all further questioning at that or any future time. In support of this proposition, he quotes the following from *Miranda,* 384 U.S., at 473:

> If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. [Footnote omitted.] At this point, he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody

interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.[2]

This language is not controlling in defendant's situation. As stated by the court in *Jennings v. United States*, 391 F.2d 512, 515 (5th Cir. 1968), "[W]hat the Court sought to interdict in *Miranda* were those situations in which a person has indicated his desire to exercise his constitutional right of silence but the police refuse to take 'no' for an answer." The police are bound not to browbeat or otherwise pressure an accused in an attempt to get him to relinquish a claim of privilege. The police did nothing of that sort here. Defendant never indicated that he wished any of the interrogation sessions stopped; rather, in response to particular questions he advised his interrogators that he would "rather not say." In all cases when this answer was received, that particular line of questioning was immediately dropped by the police. In one instance, defendant indicated that he would rather not answer until he consulted his attorney. Upon receiving this answer, the police ceased all questioning until he had consulted his attorney. Two days later the questioning resumed along the same line, but when defendant again indicated he would rather not say there was no further mention of the subject. These circumstances were foreseen, and the right of the police to continue questioning under these circumstances was affirmed by the court in *Miranda*, 384 U.S. at 445:

The mere fact that he may have answered some questions or volunteered some statements on his own does not

---

[2]A recent interpretation of this language is contained in *People v. Fioritto*, 68 Cal. 2d 714, 68 Cal. Rptr. 817, 441 P.2d 625 (1968), where defendant's refusal to sign a form waiving his constitutional rights was held to be a claim of privilege barring all further interrogation. But see *Hodge v. United States*, 392 F.2d 552 (5th Cir. 1968). However, the issue of whether a defendant may knowingly claim his privilege to remain silent with respect to certain questions while continuing to answer others was not presented in either *Fioritto* or *Hodge*.

deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney *and thereafter consents to be questioned.*

(Italics ours.)

This is not a case where the police refused to take "no" for an answer, or attempted to pressure the accused into relinquishing his claim of privilege. Rather, the police in this case scrupulously respected all claims or privilege by the accused.

■ We therefore hold, under the circumstances of this case, where an accused declines to answer specific questions without indicating a desire that all interrogation cease and the police continue questioning upon different subjects, admissions upon these subjects are not invalidated merely by the earlier refusal to answer specific questions on other matters.

■ Defendant's final assignment of error is the court's failure to grant his motion for a directed verdict. He contends the state's evidence failed to establish the required causal connection between the death and the alleged criminal conduct of defendant. The corpus delicti in a homicide case consists of (1) the death and (2) a causal connection between the death and a criminal agency. *State v. Lung,* 70 Wn.2d 365, 423 P.2d 72 (1967). These factors may be established by either direct or circumstantial evidence. *State v. Anderson,* 10 Wn.2d 167, 116 P.2d 346 (1941). The corpus delicti having been established, it is incumbent upon the state to identify the accused therewith. *State v. Meyer,* 37 Wn.2d 759, 226 P.2d 204 (1951).

The fact of death is clear. The criminality of the cause of death is equally beyond doubt. Thus corpus delicti has been proved beyond any reasonable doubt. This leaves the issue of whether there is sufficient evidence by which a jury is entitled to find, beyond reasonable doubt, that defendant was the perpetrator of the criminal act. We need not again recite the facts established by the state which carry this question to the jury. We have, due to the gravity of the case, already extensively set forth the evidence. We now

only add that such facts are sufficient to support the jury verdict. The court did not err in denying the motion.

After the appeal was heard, the Supreme Court decided *Witherspoon v. Illinois,* 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968). In view of that decision, we held a rehearing on the issue of the exclusion of prospective jurors because of their views on capital punishment.

The authority to challenge a prospective juror for cause because of his or her beliefs against capital punishment depends in part upon RCW 10.49.050, which reads:

> No person whose opinions are such as to preclude him from finding any defendant guilty of an offense punishable with death shall be compelled or allowed to serve as a juror on the trial of any indictment or information for such an offense.

This statute was adopted in its present form in 1891 (Laws of 1891, ch. 28, § 67). At that time, murder in the first degree was punishable by death only. In 1909, the legislature added the alternative punishment of life imprisonment and left the decision as to which sentence was to be imposed to the discretion of the court (Laws of 1909, ch. 249, § 140). In 1913, the legislature abolished the death penalty for first degree murder (Laws of 1913, ch. 167). In 1919, the legislature again added the death penalty for first degree murder, and adopted the present method of having the jury make the decision on capital punishment (Laws of 1919, ch. 112).

Defendant's initial contention on this issue is that RCW 10.49.050 was impliedly repealed by the 1909 act placing the decision to impose capital punishment with the court, or by the 1913 act abolishing capital punishment for first degree murder.

Repeals by implication are not favored. A later act will not operate to repeal an earlier act unless the later act covers the entire subject matter of the earlier legislation, is complete in itself, and is patently intended to supersede prior legislation on the subject, or unless the two acts are so clearly inconsistent that they cannot be reconciled and

both given effect by any fair and reasonable construction. *State Bd. Against Discrimination v. Board of Directors, Olympia School Dist. 1,* 68 Wn.2d 262, 412 P.2d 769 (1966); *Taylor v. Greenler,* 54 Wn.2d 682, 344 P.2d 515 (1959); *Tacoma v. Cavanaugh,* 45 Wn.2d 500, 275 P.2d 933 (1954); *State v. Becker,* 39 Wn.2d 94, 234 P.2d 897 (1951).

██ RCW 10.49.050 by its terms applies to juries sitting in a case involving "an offense punishable with death;" whereas the 1909 and 1913 acts referred to by defendant dealt exclusively with first degree murder. During this period treason was also an offense punishable by death (Laws of 1909, ch. 249, § 65), and this penalty was not repealed by either of the two acts. Therefore, the 1909 and 1913 acts did not cover the entire subject matter covered by the earlier statute which is now RCW 10.49.050. We hold that RCW 10.49.050 was not repealed by either Laws of 1909, ch. 249, or Laws of 1913, ch. 167.

██ Defendant's second contention is that RCW 10.49.050 has been rendered unconstitutional by the holding in *Witherspoon v. Illinois, supra.* This contention was fully considered in *State v. Smith,* 74 Wn.2d 744, 446 P.2d 571 (1968). We there held that exclusion of a juror whose opposition to the death penalty is such that he could never impose it was authorized under RCW 10.49.050 and 10.49.040; and that this exclusion was expressly permitted in *Witherspoon. See also, State v. Aiken,* 75 Wn.2d 421, 452 P.2d 232 (1969).

*Witherspoon v. Illinois, supra,* held that an Illinois procedure in which all prospective jurors in a capital case who harbored doubts about the wisdom of capital punishment were excused for cause during voir dire proceedings violated a defendant's right to an impartial jury guaranteed by U.S. Const. amend. 6 and amend. 14. The court made it clear, however, that the decision is limited and does not constitute a blanket indictment of all juries from which veniremen have been excluded for views on the death penalty. The scope of *Witherspoon* appears to be succinctly set forth on page 522, n.21:

We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.* Nor does the decision in this case affect the validity of any sentence *other* than one of death. Nor, finally, does today's holding render invalid the *conviction,* as opposed to the *sentence,* in this or any other case.

RCW 10.49.050 does not transcend the holding as thus delineated.

This leaves for consideration the question of whether the exclusion for cause of prospective jurors in this case because of their opposition to capital punishment violates the dictates of *Witherspoon.*

Thirty-three veniremen were examined on voir dire before a jury was impaneled. Of these, 13 were excused because they indicated opposition to the death penalty. Ten of those excused in response to questions from the court clearly indicated that they could not inflict the death penalty in a proper case. This amounts to a statement that they would automatically vote against the death penalty regardless of the evidence introduced at trial. The exclusion of these jurors did not violate *Witherspoon.*

 The voir dire testimony of the remaining three prospective jurors who were excused for cause because of their indicated opposition to the death penalty requires more complete consideration. The first of these, Mrs. Baca, originally indicated some doubts about the death penalty, but concluded she could vote for the death penalty "if he was guilty." Later, after the court had questioned other prospective jurors, Mrs. Baca apparently changed her mind and stated, "that I just don't feel I could condemn this boy to death." She indicated that the reason for this feeling was the age of the defendant. She was then excused for cause.

The record clearly supports the proposition that Mrs. Baca had decided that she could not vote for the death penalty in this case. Although such a vote might not be "automatic" in *all* cases, it evidently would have been constant in this case regardless of the evidence presented at trial. Under these circumstances the prospective juror cannot be said to be "neutral" with respect to the penalty and was properly excused.

The following is a portion of the voir dire examination of the prospective juror, Mrs. Osborn:

> The Court: You have heard the questions that I have asked the other jurors, and you have heard the questions that counsel have asked. Is there anything that comes to your mind now that you feel disqualifies you in any wise in this case? Mrs. Osborn: I don't believe in capital punishment. The Court: That is a pretty good disqualification. Mrs. Osborn: I think so. The Court: All right, Ma'am, you are excused.

This exchange is almost identical to that of at least two of the prospective jurors in *State v. Aiken, supra.* Mrs. Osborn was the 24th prospective juror examined and had heard 10 of these excused after being given questions about their views on capital punishment which satisfied the *Witherspoon* requirements. The court specifically referred her to these previous questions when asking her if she felt that there was any reason she should be disqualified. In *State v. Aiken, supra,* at 443, we made the following comments upon a similar situation:

> Each had heard the voir dire questions concerning capital punishment repeated with almost monotonous regularity and each had the opportunity of noting the responses and rulings with respect thereto. In this context it would be wholly unrealistic to assume that each did not understand what part their convictions with respect to the death penalty would play in their possible selection as jurors, and it would be equally unreasonable to presume that the learned trial judge misinterpreted their responses or the depth of their convictions when they were before him and he was questioning them. . . . Though it may be conceded that the voir dire testimony of these . . . veniremen could, from the standpoint of

appellate review, have been more complete and definitive, we are convinced from the voir dire testimony of the panel as a whole that the trial judge did not violate the spirit of *Witherspoon* [*Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968)] in excusing them on the basis of their statements and his evaluation of them.

The same conclusion is warranted with respect to the voir dire questioning of Mrs. Osborn. Her remarks when read in conjunction with the total record of the voir dire proceedings negate any conclusion that she merely harbored doubts about the wisdom of capital punishment.

The voir dire interrogation of the prospective juror, Mrs. Chapman, raises the most difficult question. Her examination, insofar as relevant, proceeded as follows:

The Court: Well, Mrs. Chapman, have you any conscientious scruples against the infliction of the death penalty in a proper case? Mrs. Chapman: Well, I have been fighting with myself all weekend. I don't know if I could hang anybody, to be honest. The Court: Well, I'm not asking you to do any hanging. We are asking you whether or not under the circumstances you could conscientiously vote for the execution of a man under the laws of the State of Washington, assuming the situation merited it? Mrs. Chapman: I don't know. The Court: Well, I think we have to have a little more definite answer than that, Ma'am. I appreciate that this is a real difficult question for anyone to answer and I am certainly not critical of your indecision in the matter, but if you have some abiding belief that is going to make it very difficult for you to do so, then I think perhaps we should excuse you. What do you think? Mrs. Chapman: I think you probably should excuse me. The Court: All right, you have it. You are excused . . .

There can be no doubt that the court's second phrasing of his question is an incorrect statement of the *Witherspoon* test. The question is not whether the veniremen would find it "very difficult" to impose the death penalty, but whether it would be impossible for her to do so regardless of the evidence admitted at trial.

Mrs. Chapman, again was one of the last prospective

jurors examined. Her responses to the court indicate that she properly understood the test to be whether she could, under any circumstances, vote for the death penalty. However, it is impossible to say from the record whether she finally resolved this question, or whether the court's more lenient phrasing of the question offered her a ready escape from her struggle with her conscience.

If we assume the latter, then the question is whether the incorrect exclusion of one potential juror requires a reversal of the sentence even though the record indicates that the voir dire examination of all the other prospective jurors followed a correct approach with regard to the question of capital punishment. We do not believe it does.

■■■ A similar question was presented in *Bell v. Patterson*, 402 F.2d 394, 399 (10th Cir. 1968), where the court held:

> It cannot be said that the exclusion of two prospective jurors whose testimony did not indicate a pre-trial commitment to irrevocably vote against the death penalty resulted in a jury that failed to reflect "the evolving standards of decency that mark the progress of a maturing society." This is because all other excluded jurors did acknowledge an unwaivering attitude in this regard, and further, there were prospective jurors who did indicate conscientious scruples but whom the court refused to excuse for cause. Hence, viewing the jury selection process in its entirety by weighing the responses of the excluded and non-excluded prospective jurors, it cannot be said that "the State crossed the line of neutrality" and entered the domain of the impartial jury proscribed by the Sixth and Fourteenth Amendments.

(Footnotes omitted.)

This question was also raised in *State v. Mathis*, 52 N.J. 238, 250, 245 A.2d 20 (1968), and the court reached the same conclusion:

> But where the trial court correctly understood the controlling principle, it does not follow that the erroneous exclusion of a single juror or any specific number of jurors must call for a reversal. Rather the question is whether the totality of the trial court's treatment of the

subject operated to deprive the defendant of an opportunity for a jury of a representative quality.

*But see In re Anderson,* 69 Cal. 2d 714, 73 Cal. Rptr. 21, 447 P.2d 117 (1968).

The question is whether prospective jurors representing a substantial segment of community thought are systematically and indiscriminately excluded for cause. *See State v. Aiken, supra.* We find no systematic exclusion of veniremen in the court's mistaken rephrasing of a question to one prospective juror who had been present during the proper examination of numerous prior veniremen. Rather, from our review of the total record of the voir dire proceedings, we conclude that the proceedings avoided any partiality which would deny defendant a representative jury within the spirit of *Witherspoon.*

Affirmed.

HUNTER, C. J., FINLEY, HALE, and McGOVERN, JJ., concur.

ROSELLINI, J. (dissenting)—In my opinion, this court has at last been presented a case in which the defendant has been able to show that the trial court abused its discretion in admitting inflammatory photographs, and a new trial should be ordered.

The majority seems to feel that, because we have never found that the introduction of photographs constituted prejudicial error, we are committed to the philosophy that the trial court's exercise of discretion on such matters is not subject to review. The trouble is, I fear, that every time we refuse to reverse in a doubtful case, the impression is created that the prosecutor is free to go a little further next time. I also fear that, if this trend is allowed to continue, pictorial appeals to the emotions of the jury may become an accepted substitute for proof that the defendant committed the crime.

The rule should be that photographs having a tendency to inflame the passions of the jury should be admissible only if they are actually probative on some element of the crime, and if they have not been unnecessarily distorted.

We have in this case what appears to me to be an example of deliberate and totally unnecessary distortion. I do not mean that an autopsy was unnecessary, or that the jury was not entitled to know the results of the autopsy. I do mean that the inflammatory photographs were unnecessary because the prosecutor's and/or the investigators' photographers were on the scene and secured photographs which accurately and extensively portrayed the condition of the body as it was left at the scene of the crime and the nature of the wounds. These matters were adequately portrayed in photographs introduced at the trial and to which the defendant offers no objection.

I readily acknowledge that the prosecutor was entitled, if not required, to prove in detail how the death resulted from the wounds. But this was not done by showing pictures. It was done by medical testimony. In fact, it was a picture of the victim with the black eyes which *created* the apparent ambiguity which the prosecutor felt it was necessary to have resolved by medical testimony that blows from the rear would cause this condition.

If the jury could not understand the simple medical testimony on this, how was it to analyze an opened skull with the scalp laid back and the brains spilling out? The fact is that there was no issue in this case regarding the cause of the death of the victim, the instrument which inflicted it, or the manner in which it was wielded. Of course, it was incumbent upon the prosecutor to prove these things, but he made this proof by other extensive and uncontradicted evidence. The only serious question concerned the identity of the killer. These photographs threw not one flicker of light on that subject.

It is interesting that the majority refrains, whether carefully or unconsciously I need not speculate, from giving any description of the photographs. Some description is necessary if the opinion of the court is to have any meaning for the reader. In the first place, it must be noted that all of the photographs were color slides, which showed the victim's mutilated body in vivid color, as hereinafter described.

There were eight pictures depicting the victim, some showing her head before the cleaning away of dried blood and some showing her head after the autopsy surgeon had cleaned away the blood (state's exhibits, 113, 114, 115 and 116). Exhibit 111 is of the interior of the skullcap after it had been removed and shows the shape and size of a fracture. While none of these are particularly pleasant to view, they are, to borrow a phrase from the Pennsylvania court in *Commonwealth v. Eckhart,* 430 Pa. 311, 242 A.2d 271 (1968), a veritable Michaelangelo compared to the other pictures. The other pictures (exhibits 109, 110 and 112) show the victim's head after the scalp has been peeled forward (110 and 112) and after the skull cap has been removed. Exhibits 110 and 112 are a grisly view of the excised scalp and bloody hair. Exhibit 109 is a direct view into the empty cranial cavity after the skull cap had been removed and the brain extracted. The picture also shows the disemboweled corpse and displaced entrails.

It is these last three pictures which, in my opinion, were so inflammatory that any relevancy they may have had was totally obscured by their tendency to arouse the emotions of the jury rather than to expedite its thinking processes.

While it is true that, as we have stated more than once, a picture is not rendered inadmissible simply because it is gruesome, it is also true that a picture should have some valid tendency to throw light on the issues before the jury; and if the amount of light which it can throw is so minimal that its apparent object is to inflame rather than to enlighten, we should hold the admission of such a picture an abuse of judicial discretion.

Courts in other jurisdictions, faced with similar questions, have so held. As the majority observes, the test of admissibility is whether the probative value of the pictures outweighs their probable prejudicial effect. Photographs which show the body of the deceased after autopsy have frequently been held inadmissible upon this ground (*see Kiefer v. State,* 239 Ind. 103, 153 N.E.2d 899 (1958) and cases cited therein) particularly when they are used to

illustrate a physician's testimony which was not disputed and could have been easily presented without the aid of the photographs. *See State v. Bischert*, 131 Mont. 152, 308 P.2d 969 (1957); *People v. Lefler*, 38 Ill. 2d 216, 230 N.E.2d 827 (1967).

It is true that the autopsy surgeon in this case said that the slides would be "most helpful" in presenting his testimony, but he did not state that they were necessary to his testimony. The difference between "most helpful" and "necessary" is a real one, and when the inflammatory nature of a photograph is obvious, and where, as here, it shows the body of a victim mutilated, not by the defendant alone but by the surgeon's knife, a sound exercise of discretion should incline the court to exclude it.

In my opinion, the autopsy surgeon's testimony in this case was simple enough to be understood by any juror. Graphic illustrations were not needed; and even if they were, those which were presented were far more gruesome than was necessary to illustrate the doctor's points. The doctor did not say they were necessary but only that they would be "helpful." A drawing would have done as well without the concomitant appeal to the passions of the jury. These photographs did not depict the body in the condition in which it was left by the killer and they were not needed to fortify the prosecution's case on a disputed issue of fact. In short, their prejudicial effect outweighed their probative value, if they had any at all.

None of the cases cited in the majority opinion, which have been decided by this court, involved pictures so *unnecessarily* gruesome and of such questionable relevance as those to which the appellant objected in this case. In *State v. Hawkins*, 70 Wn.2d 697, 425 P.2d 390 (1967), the allegedly objectionable photographs showed the bodies of the two victims of the crime in the condition in which they were found and were held admissible to show the nature of the wounds and exactly what the investigating officers found at the scene of the homicide. There were no alleged distortions.

The slides and photographs to which objection was made in *State v. Little,* 57 Wn.2d 516, 358 P.2d 120 (1961), did indeed show the body of the victim during the autopsy. It was not the contention of the defendant that the bodies were distorted by the autopsy procedure, but that wounds appeared on it which were not there immediately after the altercation which the state maintained was the cause of the victim's death. It was the position of the defendant that the death was due to injuries suffered in the hospital after the fight. There the exact cause of the death was an important and disputed issue and the pictures were held to be relevant and admissible as bearing upon this question. Here there was no dispute as to the cause of death.

In *State v. Griffith,* 52 Wn.2d 721, 727, 328 P.2d 897 (1958), photographs of the victim taken at the scene and at the morgue were introduced in evidence and we held that they were competent

> not only to establish the identity of the victim, but to show the manner in which [the victim] was killed, the existence of the marks on the wrists, the existence of intent on the part of the appellant, and to aid the jury in understanding the physical facts relevant to the crime.

There was no contention that the appearance of the body had been made more gruesome by the autopsy.

*State v. Nyland,* 47 Wn.2d 240, 287 P.2d 345 (1955), another case cited by the majority, was also a case in which the defendant did not contend that the appearance of the bodies had been changed after the killings. The pictures, taken at the morgue, showed the wounds and the autopsy incision, but did not show organs removed or exposed by the autopsy surgeon's knife. In that case, the trial court had admitted only two black and white photographs and excluded others offered, apparently finding them unnecessarily inflammatory. We held that his discretion had been properly exercised.

Any statements concerning the admissibility of gruesome photographs contained in *State v. Payne,* 25 Wn.2d 407, 171 P.2d 227, 175 P.2d 494 (1946), is dictum, inasmuch as we held that the error, if any, could not be considered,

no objection having been made at the time they were admitted.

The photograph introduced in evidence in *State v. Hardamon*, 29 Wn.2d 182, 186 P.2d 634 (1947), showed the bandaged head of an assault victim. It was, if anything, probably less inflammatory than a picture of his unbandaged head would have been. The appellant offered no showing that the trial court had abused its discretion in admitting the photograph.

The earliest case cited by the majority, *State v. Smith*, 196 Wash. 534, 83 P.2d 749 (1938), was concerned with the admissibility of a photograph of the exhumed body of the victim taken 4 months after autopsy and interment. This photograph probably was the most inflammatory of any of those considered by this court in the cited cases. However, it had a particular relevance because there was a serious dispute between the prosecution and the defense as to the type of wounds inflicted by the defendant, the latter maintaining that he had only struck the deceased with his fists, and that his death was caused by his striking his head on something when he fell to the ground. It was the prosecution's theory, however, that the defendant had used unnecessary force in repelling an attack by the deceased and had administered him a terrible beating, during which he kicked him with his heavy shoes while he was on the ground. In that case, therefore, the nature of the wounds received by the victim was of vital significance. The doctors testifying about these wounds said that they could better explain these wounds to the jury by the use of the photograph.

That case is of particular interest here, not only because the offered evidence was gruesome and the picture did not show the body as it looked at the time of or immediately after the crime, but because it quotes at some length a passage from 2 Wharton's Criminal Evidence § 773, at 1319-20-21 (11th ed. 1935), which this court approved as a correct statement of the applicable rule. That quotation reads:

"It is generally stated that the locality or condition of

the objects photographed must be the same as those that existed at the time of the commission of the crime. This is to be taken in a substantial sense, however, as a slight change in the conditions existing at the time a photograph was taken does not necessarily call for the exclusion of the photograph if it will not mislead, or tend to mislead, the jury. . . . Photographs showing the wounds of a deceased person are admissible, although they do not show or purport to show all of the wounds received which result from the commission of the homicide charged.

"Admissibility of photographs does not depend upon whether the objects they portray could be described in words, but rather on whether it would be useful to enable the witness better to describe, and the jury better to understand, the testimony concerned. Where they are otherwise properly admitted, it is not a valid objection to the admissibility of photographs that they tend to prejudice the jury. Competent and material evidence should not be excluded merely because it may have a tendency to cause an influence beyond the strict limits for which it is admissible."

*State v. Smith, supra* at 543-44.

As I have mentioned, the evidence in that case, although gruesome and although the picture was taken at a time rather remote from the crime and when changes had taken place in the appearance of the victim, was relevant and material on a vital issue in the case—that is, the nature of the wounds inflicted. If the wounds were as the defendant maintained, he would probably have been able to prevail in his contention that he acted in self-defense, using no more force than was necessary; but if they were as the prosecution maintained, excessive use of force would have been established. With the use of medical testimony, aided by the photograph, the prosecution was able to prove its case to the satisfaction of the jury.

But particular attention should be paid to the fact that the defendant did not contend that the prosecution had other photographs taken before the body was interred, which would have been as useful in illustrating the wounds, or that it acted in bad faith in waiting 4 months to

exhume the body. Furthermore, one of the doctors said that the wounds were still recognizable in the photograph and that the situation could be demonstrated *just as it was at the time the body was buried.*

It would be absurd to suggest that, in the case before us, the condition of the victim's body just as it was at the time it was found could be illustrated by the photographs of the head with the cap removed, the scalp laid back, the brain extracted, and the intestines visible in the background. As the quoted passage from Wharton's states, the general requirement is that the condition of the object photographed must be the same as that which existed at the time of the commission of the crime. While the killer in this case did inflict ugly wounds upon the victim, unquestionably causing her death, he did not lay open her skull and cause the brains to spill out and he did not cut open her abdomen. As Wharton's says, a slight change in conditions is permissible if it will not mislead or tend to mislead the jury.

In my opinion, the relevance of the photographs showing the autopsy process in this case was so slight and their inflammatory tendencies so great, and the nature of the wounds and cause of death was so well established by other, undisputed evidence, that the only conceivable purpose in offering these color slides must have been to mislead the jury by creating an impression of a crime even more horrible than the one which was actually committed.

This was a case resting upon circumstantial evidence, and in such a case proof beyond a reasonable doubt is not easy. But, even assuming that the verdict of guilty was the only verdict which reasonable men could return, there still remains the question of the death sentence. To assume that color pictures showing the victim's body in a condition even more horrifying than the killer left it are not likely to influence this decision of the jury, is, it seems to me, to renounce any knowledge of human nature. When a man's life is at stake, even that of a man who has himself committed a heinous crime, this court should be meticulous in its concern that he receive a fair trial. Placing before the jury these sickening photographs, whose only legitimate value

could be to further prove that which had already been proved beyond the shadow of a doubt many times over, could only result in the denial of such a trial.

It is time that some limitations are placed upon the use of the art of photography in swaying the jury. If the text which is so frequently cited—Is the minute peg of relevancy totally obscured by the dirty linen hung upon it?— ever required the exclusion of photographs, it required the exclusion of these.

I would reverse and order a new trial.

HILL, WEAVER, and HAMILTON, JJ., concur with ROSELLINI, J.

---

November 24, 1969. Petition for rehearing denied.

*Reported in 458 P.2d 548.